**FIREMEN'S INSURANCE COMPANY OF NEWARK, NEW JERSEY,**
Appellant,

v.

**ROBBINS COAL COMPANY, Inc.,**
Appellee.

**No. 18532.**

United States Court of Appeals
Fifth Circuit.

March 30, 1961.

Rehearing Denied May 11, 1961.

Joseph S. Mead, Emmett R. Cox, Birmingham, Ala., for appellant.

John S. Foster, Birmingham, Ala., for appellee.

Before TUTTLE, Chief Judge, and CAMERON and WISDOM, Circuit Judges.

TUTTLE, Chief Judge.

At the threshold of this case we are met by a motion by the appellant to permit it to amend its petition for removal from the state court in order adequately to allege grounds of diversity jurisdiction. The difficulty arose because of the 1958 amendment to the removal statute, 28 U.S.C.A. § 1332(c), which now defines corporate citizenship to include any state in which a corporate party has its principal place of business. The petition for removal alleged diversity in the following terms:

"Petitioner further shows that the plaintiff, Robbins Coal Company, Inc., a corporation, at the time of the beginning of said action and ever since has been and still is a citizen of the State of Alabama; that the petitioner, the defendant in this cause, at the beginning of said action and ever since has been and still is a corporation organized and existing under and by virtue of the laws of the State of New Jersey, and is a citizen of said State; that the controversy in said cause of action is entirely between citizens of different states; * * * "

■ Recognizing that the specific allegation of citizenship may be inadequate to aver diversity jurisdiction, see Kinney v. Columbia Savings & Loan Ass'n, 191 U.S. 78, 24 S.Ct. 30, 48 L. Ed. 103, and that a jurisdictional defect must be noticed by this Court sua sponte, even though not raised by the adverse party, the appellant, the removing party below, moved here to cure this omission in its petition for removal. It seeks to add the allegation that the plaintiff's principal place of business was in Alabama and that the defendant's principal place of business was in New Jersey. This would cure the defect.

The appellee does not dispute, but in fact concedes, the truth of the allegations, and agrees that it also believes that it is permissible for the appellant to file such an amendment.

We agree. This Court has held that a defective allegation of diversity jurisdiction in a suit originally filed in a federal district court can be amended in the Court of Appeals. Kaufman v. Western Union Telegraph Co., 5 Cir., 224 F.2d 723. We think this is authorized by the provisions of 28 U.S.C.A. § 1653:

"Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts."

Moreover, we think this same right should obtain with respect to a petition for removal. See Park v. Hopkins, D.C. S.D.Ind., 179 F.Supp. 671. The general allegation in the original petition for removal in this case, "that the controversy in said case is entirely between citizens of different states," although conclusionary in nature and possibly not sufficient if not amended, is sufficient to confer jurisdiction on the federal courts to permit the curing of the defect by amendment. See Kinney v. Columbia Savings & Loan Ass'n, supra.

■ We conclude, therefore, that by the allegations relating to citizenship asserted in appellant's motion, and conceded by appellee's response, the original motion for removal is hereby deemed to have been amended to incorporate the additional allegations of citizenship. As thus amended, the removal was proper.

The principal question on the merits of the appeal is whether the plaintiff made out a sufficient case to warrant a submission by the trial court to the jury the plaintiff's contention that an expensive coal-loading structure collapsed as a result of a "landslide, slide," which was the peril insured against in the defendant's policy.

Although it is difficult to outline the contentions of the parties without photographs or drawings, we believe the factual situation necessary for a disposition of the legal issues can be recited in a simplified form.

The collapsed structure was in the nature of two large coal bins which were joined by a conveyor to a tipple. We are not concerned with the conveyor or the tipple. The coal bins were built

on a steel frame over a north-south spur railroad track. The steel frame was supported by six steel I-beams. Extending out from the east, or road, side of the frame were two conveyor belts by means of which coal could be delivered from the bins to trucks standing on a road that paralleled the railroad track. This road was built at a level some ten feet higher than the railroad level, and was separated from the railroad tracks by a steep bank and a walkway alongside the tracks. The conveyor belts were supported by an additional steel structure consisting of steel beams resting on three steel I-beams. It was undisputed that these upright I-beams did not bear any of the load of the coal bins. They formed a line of three beams parallel to the steel I-beams that supported the bins. Two of the columns supporting the conveyor belts were bolted onto concrete blocks imbedded at the top of the bank. A third one, (designated in exhibits and hereafter called, column B, and which is the column as to which all of the litigation relates) was bolted onto the center of three steel channels which were in turn bolted onto a two-foot by three-and-a-half-foot steel plate. This entire footing was based "on solid ground" at the bottom of an excavation in the bank of some four feet depth. The record does not indicate whether this excavation was left open or was later filled in. However, it is undisputed that it was protected by a stone retaining wall on the upper side, and that this wall was still in place after the collapse.

On February 23, 1958, the coal bins collapsed and fell towards the road. Photographs taken after this casualty show both the I-beams supporting the bins and the I-beam supporting the conveyor structure badly twisted and bent in the direction of fall. Stated as simply as possible, the plaintiff contended that a movement of the earth amounting to what is contemplated in the insurance policy under the definition of "landslide, slide," caused this beam to drop or slide from two to four feet; that this caused a pull through a tie rod on the center of the three easterly beams supporting the coal bins, and that this brought about the fall of the entire structure.

The defendant contends that the plaintiff failed in its proof to show that a movement of earth of any kind took place. It contends that the collapse took place by reason of the failure of the beams supporting the coal bins; that this caused the bins to fall over on beam B and thus caused it to bend and twist in the form in which it was found after the occurrence.

██ Clearly we should not undertake to resolve such a question of fact if there is substantial evidence to support the respective theories advanced by the parties. The burden of proof that a "slide" occurred and caused the damage is on the plaintiff. Evidence, in order to warrant submission to a jury, must present something more than a theory which will permit speculation, see Galloway v. United States, 319 U.S. 372, 395, 63 S.Ct. 1077, 87 L.Ed. 1458, and it must be something more than a mere scintilla. Martin v. Burgess, 5 Cir., 82 F.2d 321; New York Life Ins. Co. v. Sparkman, 5 Cir., 101 F.2d 484; Reuter v. Eastern Air Lines, 5 Cir., 226 F.2d 443, 445; Nashville Bridge Co. v. Ritch, 5 Cir., 276 F. 2d 171.

█ In view of the fact that no witness testified to the actual fact of any movement of the earth, and that a finding by the jury of such movement must necessarily have resulted by a process of inferring that fact from surrounding circumstances, it becomes necessary that we carefully review the evidence in support of the plaintiff's theory. Of course, in doing so we must view the evidence supporting the plaintiff's position most strongly in its favor. See Shaw v. Edward Hines Lumber Co., 7 Cir., 249 F.2d 434; Burcham v. J. P. Stevens & Co., Inc., 4 Cir., 209 F.2d 35. Except as just stated, we do not, of course, have the power to weigh the evidence.

Support for the plaintiff's theory was in the nature of expert testimony given by a qualified engineer who theorized

that *if* column B dropped between two and four feet this would have exerted some 60,000 pounds of pull on a tie rod connecting column B to the center support column for the bins and would so throw the structure out of balance as to bring down the coal bins in the manner in which they fell. Support for the hypothesis that column B had dropped from two to four feet was supplied by the testimony of plaintiff's vice president Haughton, who testified that upon examining column B after the collapse it was "down lower on the bank," and that "it was about, I would say, two or three or four feet lower than what it normally was." In response to a question, "Do you know of your own knowledge as to whether or not when these bins fell on column [B] and bent it, whether or not that caused it to move or not?" Haughton answered, "I couldn't answer that." Haughton also testified that there was a part of the bank in place before the collapse but that after the collapse and after the debris had been removed, the bank was not there.

In dealing with the facts, we conclude that the jury could have found that if column B moved first then this brought about the collapse. The jury could also believe that the footing of the column was from two to four feet lower after the collapse than it had been before. The jury could also believe that the ground surrounding the footing was a type of soil that was susceptible to sliding under certain conditions of moisture; thus, even though the steel plate and channel beams were 24 x 42 inches in surface contact on what the plaintiff's vice president Haughton said was "solid earth," there was testimony from which the jury could believe that the foundation earth *could* have shifted. There was also meteorological testimony to the effect that the rains were heavy preceding the occurrence and that there had been a high incidence of alternating freezing and thawing temperatures.

Testimony touching on the conditions against which these circumstances must be evaluated are: the bins were sub-stantially filled with coal and the weight on the beams supporting them was considerably greater than that recommended as safe under some recognized engineering standards; the two middle bin-supporting columns were supporting some 62 tons each, or 124,000 pounds; some vibration in the structure resulted from the sifting of the coal when loading operations were under way; column B supported weight of less than 3,000 pounds. On the poorest foundation it would support some 14 tons or 28,000 pounds; it was resting on solid earth; the total weight of the bins when they fell over onto column B or onto the beam connecting it to the next column was sufficient to bend that column into the shape of the letter C; the only eyewitness who testified to seeing *any* column move or bend was a coal truck driver named Woods, who saw one of the support columns for the bins (the southeast column hereafter called F) "quiver" and "sink down". There were railroad cars on the track being filled. Another witness had testified that he had heard two cars bump. Woods then takes up the following story:

"Well, I was watching the boys on the truck, and the first thing I discovered, I heard just a kind of pop or a crack, and I noticed that this post right on this front corner this way, I noticed it quivered, and kind of sank down a little, and then started leaning over (indicating and illustrating).

"Q. I will ask you to state whether or not you are referring to the post that was on the bank. A. Yes, sir, just this here post right here—put your pointer up there and I will show you.

"Q. I would rather for you to point it out. A. It was this here one right here (indicating).

"Q. It was not the one on the bank? A. Well, I looked at this one, and this one was quivering, and I saw it start coming over and I began to get out of the way.

"Q. My question was what post that you first saw, what part of it you first saw going down. A. This one right here (indicating).

"Mr. Foster: I can only plead surprise. He doesn't understand the diagram because that's not what I understood him to say before.

"The Court: Are you referring to the post on the bank (column XXX) or the post under the bank (southeast main column) that you first saw moving?

"The Witness: The main column right here, sir (indicating).

"The Court: The one under the bank?

"Mr. Mead: No, the one on the railroad track.

"Q. The one on the railroad track? A. Yes, sir.

"Mr. Foster: I am pleading surprise, that's all I can say. I have talked to him twice before. * * *

"Q. I will ask you, Mr. Woods, whether or not it was asked you (referring to a statement made by the witness before the filing of suit) whether or not your attention was attracted to this column right here, or the one under the conveyer bucket? (Column XXX(B)). A. The first one I noticed, sir, was this one right here (indicating the southeast main column). I just happened to notice that way, this one right here.

"Q. You were standing where you could see this column here under the conveyer belt, were you not? (Column XXX(B)). A. Yes, sir, I could see it, but I didn't notice that one (indicating column XXX(B)).

"Q. You didn't notice that one? A. I didn't notice it to begin with. I began to get out of the way from there.

"Q. How long had this column here that you marked column A in Exhibit A to your statement (southeast main column), how long had

that been moving before you noticed the column under the conveyer belt move? A. Well, I would say half a minute, or hardly that long.

"Q. In other words, this column over here, Exhibit A to the photograph to your statement (southeast main column under dust bin), you think began to vibrate before the column under the conveyer belt (column XXX) began to move or vibrate? A. I wouldn't say it did before, because I wasn't noticing that column, I was noticing the other one. I was looking towards the top of the bin.

"Q. Looking towards the top of the bin? A. Right.

"Q. Let's put it this way. Did you ever notice this column under the conveyer belt move? A. No, sir, to tell you the truth, I didn't, because I was getting out of the way.

"Q. Did the bins fall on that column (column XXX) there under the conveyer belt? A. Yes, sir.

"Q. Did it bend it? A. Well, I wouldn't say about that. It come down on it.

"Q. I will ask you whether or not, if you recall, you noticed any of the bracing or tie rods break? A. No, sir, I didn't notice them breaking until after it began to fall over. There was a lot of popping and cracking. I didn't know what it was."

The parties are in agreement that the column or post that Woods said he saw move was one of the main support columns at the side of the track and not the column B that plaintiff claimed caused the damage. The physical circumstances existing at the moment Woods saw the column "quiver" and "sink down" are that he was watching some men straight ahead of him (to the north); column B was a little to the left (west) of this direction and but a few feet from him; the column F was more to his left (farther west) and at a greater distance.

**354**

If plaintiff's theory of the occurrence is correct, then Woods glanced past column B which had dropped or was in the process of dropping from two to four feet without noticing it, and looked further on to his left and saw only the southeast column quiver and "start coming over."

We make this comment not to weigh the evidence, but to look at these undisputed observed facts against which we must view the circumstances claimed by the plaintiff to be sufficient to permit a favorable inference by the jury.

Recognizing the danger that our approach to the real issue before us may be improperly colored by the strong impression we get from reading the record and carefully examining the photographs that the collapse did not result from a moving by column B, we have carefully tried to give only such play to this impression as it deserves. That is, that we must determine whether, from the circumstances which the jury could find existed, the jury could legally infer that a slide *caused* column B to drop or whether the jury could only determine that it *might* have done so, and thus speculate rather than infer.

It does not help too much to repeat legal formulas with which all agree, but it is necessary for us to keep constantly before us the admonition that a jury verdict must be based on proven facts, including legally permissible inferences from proven circumstances, and not on pure speculation or conjecture.

"Whatever may be the general formulation, the essential requirement is that mere speculation be not allowed to do duty for probative facts, after making due allowance for all reasonably possible inferences favoring the party whose case is attacked." Galloway v. United States, 319 U.S. 372, 395, 63 S.Ct. 1077, 1089, 87 L.Ed. 1458.

We have applied the principle stated here in numerous cases in which we have found that the alleged chain of circumstances claimed to be sufficient to permit a jury's consideration is too tenuous to permit of anything more than pure speculation.

In Smith v. General Motors Corp., 5 Cir., 227 F.2d 210, 216, we said:

"The criticism in the field of logic, even though such criticism does not result in an absolute prohibition against piling inference on inference, stems from the very remoteness of the conclusion from the known facts."

In Alabama, the state whose substantive laws we here apply, the State Supreme Court has dealt with this kind of situation, using the following language:

"The proof in this case, in our opinion, goes no further than to show that the force with which the truck hit the curb wall *could* have been caused by defendants' truck driver driving at an excessive rate of speed. But we do not think that the proof warrants the conclusion that it *did* so occur, since from the same proof the force of the impact can with equal probability be attributed to mechanical failure of the truck. As we view the evidence it is without *selective application* to either of the theories of causation, and therefore, they remain conjectures only." Griffin Lumber Co. v. Harper, 247 Ala. 616, 25 So.2d 505, 509. (Emphasis added.)

See also, for cases from other states in which this Court has applied this principle, McNamara v. American Motors Corp., 5 Cir., 247 F.2d 445; J. C. Penney Co. v. Norris, 5 Cir., 250 F.2d 385; Theriot v. Mercer, 5 Cir., 262 F.2d 754; Clarkson v. Hertz Corp., 5 Cir., 266 F.2d 948, 950. In the last case we stated:

"In the case before us, it is quite apparent that there is no affirmative proof before the Court which, if believed in toto, as it must be for the purpose of summary judgment, would support a finding of negligence on the part of the defendant."

So, too, in the case before us, it must be assumed, as we have already stated, that the area where this beam was based

was of a kind that easily shifted if on a slope; that the weather conditions were conducive to such a shifting or slide; that following the collapse of the bins the column was from two to four feet lower than it had previously been, although it was not known whether it had dropped before or after the collapse upon it; and that if it dropped first, it would have pulled over the bins.

There was expert professional engineering testimony that challenged the theory that the sinking of column B would have the effect of exerting 60,000 pounds or any other amount of pull on the tie rod. Two defense expert witnesses who took this position claim that if the base of column B slipped downward and towards the railroad track (and thus towards the base of columns supporting the bins) this would not exert any pull on the tie rod, but would simply keep it in the same degree of tension as when in its original position. They theorized that the bins collapsed because of structural weakness of the columns supporting the bins themselves.

We cannot undertake to weigh the likelihood of correctness of these conflicting engineering theories. We only note that the plaintiff's witness testified that it *could* have happened the way he depicted it, and, in his opinion, it *would* have happened that way if column B dropped first; whereas, witnesses for the defendant testified that in their opinion it *could not* have happened that way even if column B had dropped first. The decision as to which theory was correct would normally be for the jury to make, if the proof showed that column B dropped first, or if there was conflicting factual testimony from which the jury could find that this is what happened. In the absence of such testimony the plaintiff makes two arguments to support his contention that there was a jury issue. One of these is, arguing backward from what happened, (a) the bins collapsed; (b) their collapse would have been caused *if* column B moved downwards; (c) there-fore, the jury could infer that column B did in fact move first. The other is that (a) column B was set in a bank in an area in a kind of soil that (b) under weather conditions then prevailing was susceptible to slide; (c) that after the bins had fallen (admittedly striking the column B or its adjacent member with sufficient weight nearly to bend it double) the base of column B was two, three or four feet lower than it had been normally; (d) therefore, column B was caused to drop by a landslide or a slide, (e) *before* the collapse.

Accepting for the purpose of this discussion the plaintiff's theory that *any* movement downward of a mass of earth, no matter how small, was a slide within the terms of the policy, we think that it would be pure speculation: first, to decide that the drop of this column took place before the collapse rather than as a result of it, and, if so, that the drop was caused by a landslide or slide rather than by any other cause that might have undermined the base or foundation, since no testimony was adduced to show that any movement of earth was observed.

We are forced to the conclusion that if the jury accepted as true, as we must assume it did, all of the testimony sworn to touching on observable facts, all this would show would be that the occurrence *could* have been caused by a slide. We do not think that all of such proof warrants the conclusion that it *did* so occur, since from the same proof the occurrence can, with equal probability, be attributed to other causes. As stated in the Alabama case, Griffin Lumber Co. v. Harper, supra, "the evidence, it is without selective application to either of the theories of causation, and, therefore, they remain conjectures only."

It follows, therefore, that at the conclusion of the presentation of evidence, the defendant was entitled to a directed verdict.

The judgment is reversed and the case remanded to the trial court for an entry of a judgment for the defendant.