Andrew **HAWKINS** et al., Plaintiffs-Appellants,

v.

**TOWN OF SHAW, MISSISSIPPI,** et al., Defendants-Appellees.

No. 29013.

United States Court of Appeals, Fifth Circuit.

March 27, 1972.

---

11. There is no indication in the record that Mrs. Cwik observed the pretrial confrontation in the corridor.

Melvyn R. Leventhal, Jackson, Miss., Jack Greenberg, Jonathan Shapiro, New York City, for plaintiffs-appellants.

Charles M. Haar, Cambridge, Mass., and Daniel Wm. Fessler, Davis, Cal., for the Joint Center for Urban Studies of the Massachusetts Institute of Technology and Harvard University, amicus curiae, in support of appellants.

Ancil L. Cox, Jr., Cleveland, Miss., William Allain, Asst. Atty. Gen., Jackson, Miss., Thomas H. Watkins, Jackson, Miss., for defendants-appellees.

Before JOHN R. BROWN, Chief Judge, and TUTTLE, WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, INGRAHAM, and RONEY, Circuit Judges.

PER CURIAM:

The court, having been convened En Banc and having heard additional oral argument and considered additional briefs, reaffirms the judgment entered by the original panel of this court, 5 Cir. 1971, 437 F.2d 1286. The court, however, makes the following statements dealing with some of the issues raised either originally or by Petition for Rehearing.

I

In judging human conduct, intent, motive and purpose are elusive subjective concepts, and their existence usually can be inferred only from proven facts. As stated in the original opinion, the record before us does not contain direct evidence which establishes bad faith, ill will or any evil motive on the part of the town of Shaw and its public officials. However, the record proof does clearly establish conduct which cannot be judicially approved.

In order to prevail in a case of this type it is not necessary to prove intent, motive or purpose to discriminate on the part of city officials. We feel that the law on this point is clear, for " 'equal protection of the laws' means more than merely the absence of governmental action designed to discriminate;

. . . 'we now firmly recognize that the *arbitrary quality of thoughtlessness* can be as disastrous and unfair to private rights and to public interest as the perversity of a willful scheme'." (Emphasis supplied.) Norwalk CORE v. Norwalk Redevelopment Agency, 2 Cir. 1968, 395 F.2d 920, 931. See also Kennedy Park Homes Association, Inc. v. City of Lackawanna, New York (2 Cir. 1970) 436 F.2d 108, 114, cert. den. 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971) · and United States ex rel. Seals v. Wiman, 5 Cir. 1962, 304 F.2d 53 at 65.

Moreover, in our judgment the facts before us squarely and certainly support the reasonable and logical inference that there was here neglect involving clear overtones of racial discrimination in the administration of governmental affairs of the town of Shaw resulting in the same evils which characterize an intentional and purposeful disregard of the principle of equal protection of the laws. See Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); Loving v. Virginia, 388 U.S. 1, 10, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1966); Snowden v. Hughes, 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497; Kennedy Park Homes Association, Inc. v. City of Lackawanna, supra; Rodriguez v. Brown, 5 Cir. 1970, 429 F.2d 269, 273; Norwalk CORE v. Norwalk Redevelopment Agency, supra 395 F.2d at page 931.

Federal Courts are reluctant to enter the field of local government operations. The conduct of municipal affairs is "an extremely awkward vehicle to manage." It is apparent from our original opinion, and we repeat here, that we do not imply or suggest that every disparity of services between citizens of a town or city creates a right of access to the federal courts for redress. We deal only with the town of Shaw, Mississippi, and the facts as developed in this record.

## II

We have carefully reviewed the record here, and it appears that various persons in the class of plaintiffs sought relief as to some of the services in question from the municipal government prior to filing suit. Although the district court found to the contrary, we do not think that finding can stand as to all of the services in view of the evidence on this point in the record. There can, therefore, be no question about the claim here being ripe for presentation to the United States Courts under the provisions of 42 U.S.C. § 1983 and 28 U.S.C. § 1343. Whatever requirements may exist as to the need of a plaintiff to demonstrate that there is such "finality" to the deprivation of which he complains as to make the cause of action "ripe" for the bringing of a federal law suit (cf. discussion in Stevenson v. Board of Education of Wheeler County, Georgia, 5 Cir. 1970, 426 F.2d 1154, cert. den. 400 U.S. 957, 91 S.Ct. 355, 27 L.Ed.2d 265; and Hall v. Garson, 5 Cir. 1970, 430 F.2d 430, 436), no such problem exists here.

Thus, this posture of the case obviates the necessity of our attempting to articulate a generally applicable principle of "finality" or "ripeness" beyond what has already been said in the cited cases. For us to do so in view of the many different kinds of "civil rights" actions that are comprehended under Section 1983, would not only be extremely difficult, but, as to other fact situations and types of actions, any statement by us would amount merely to dictum and would be purely advisory. We reiterate what we have previously said—that before any case can be considered by a federal court under Section 1983 the forbidden deprivation must be complete and final. Otherwise, the courts would merely be advancing advisory opinions, which they may not do under Article 3, Section 2 of the Constitution.

Applying the foregoing standards, it is our opinion that the case under consideration is the type of case in which federal jurisdiction should be exercised. Having reached that conclusion all that

remains is to choose an appropriate remedy and to frame the appropriate relief.[1]

### III

Here the original panel directed defendants to submit a plan to eliminate the disparities to the district court. This was a sound approach under the facts of this case. This is not to say, of course, that in another case involving deprivation of rights under Section 1983 requirement of the submission of a plan by the defendant governmental authority would be the most appropriate remedy. In some situations, presenting a simple issue, the case may be finally disposed of on appeal. In others the case may well be remanded to the district court, after a determination of the rights of the parties, for the purpose of permitting the trial court to exercise its full equitable discretion in the first instance. Here, however, the matter had received extended attention in the district court. All possible facts were available to the court. Also, according to statements at the time of oral argument, a bi-racial committee has been appointed by the municipal governing authorities to advise with the mayor and counsel regarding city services. A black citizen had been elected to the city council. These facts, taken together, would seem to indicate the feasibility of a remedy whereunder the municipal authorities will formulate a plan to eliminate the disparities. Once formulated, the plan will, of course, be subject to approval by the district court.

The judgment is reversed and remanded for further proceedings not inconsistent herewith.

1. Without attempting to determine to what extent Section 1983 and its enforcing Section 1343 are available only when the "right or immunity is one of personal liberty, not dependent for its existence upon the infringement of property rights", Hague v. CIO, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (concurring opinion of

WISDOM, Circuit Judge (specially concurring):

I fully agree with Judge Tuttle's opinion for the panel and favor adopting it as the opinion of the en banc Court. Although I agree with the result reached by the Court en banc, I disagree with some of the statements contained in the opinion by the Court en banc.

A. First, the opinion states, "In order to prevail in a case of this type it is not necessary to prove intent, motive or purpose to discriminate on the part of city officials." This I accept as an accurate statement of the law. The opinion goes on to state, however, "Moreover, in our judgment the facts before us squarely and certainly support the reasonable and logical inference that there was here neglect involving clear overtones of racial discrimination in the administration of governmental affairs of the town of Shaw resulting in the same evils which characterize an intentional and purposeful disregard of the principle of equal protection of the laws." This statement is ambiguous. It should not be read to imply that our decision in this case was based even in part on proof of motive, purpose, or intent. To imply that proof of motive, purpose, or intent is necessary to establish a basis for relief in a case such as this is to misstate the clear and unambiguous law on the subject. *See* Palmer v. Thompson, 1971, 403 U.S. 217, 225, 91 S.Ct. 1940, 1945, 29 L.Ed.2d 438, 445; Griffin v. County School Board of Prince Edward County, 1964, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256; Gomillion v. Lightfoot, 1960, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110; NAACP v. Button, 1963, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.

Mr. Justice Stone) and see Garren v. Winston-Salem, 4th Cir. 1971, 439 F.2d 140, we conclude that this is not a "property rights" case. See Hall v. Garson, 5 Cir. 1971, 430 F.2d 430 and Sniadach v. Family Finance Corporation, 1969, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349.

2d 405; Brown v. Bd. of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L. Ed. 873; Brown v. Bd. of Education, 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L. Ed. 1083.[1]

B. Second, the opinion states, "It is apparent from our original opinion, and we repeat here, that we do not imply or suggest that every disparity of services between citizens of a town or city creates a right of access to the federal courts for redress. We deal only with the town of Shaw, Mississippi, and the facts as developed in this record." I agree that not every failure to provide equal municipal services will result in a cause of action under section 1983 in federal court. I do not agree that what was said in the panel opinion and what we say here is confined to the facts of this case. The town of Shaw is not the proverbial "red-haired, one-eyed man with a limp". ￼By our decision in this case, we recognize the right of every citizen regardless of race to equal municipal services. The line will, of course, have to be drawn between those disparities which create a right of action in federal court and those which do not. Case by case development will define the contours of a federal cause of action; this case is not the vehicle for precise definition￼

C. The doctrine of "ripeness" is a component of the "cases" and "controversies" requirement of Article III, Section 2 and is essentially a problem of pre-maturity. The Supreme Court has said:

The power of courts, and ultimately of this Court to pass upon the constitutionality of acts of Congress arises only when the interests of litigants require the use of this judicial authority for their protection against actual interference. A hypothetical threat is not enough. . . . It would not accord with judicial responsibility to adjudge, in a matter involving constitutionality, between the freedom of the individual and the requirements of public order except when definite rights appear upon the one side and definite prejudicial interferences upon the other.

United Public Workers of America v. Mitchell, 1946, 330 U.S. 75, 89–90, 67 S.Ct. 556, 564, 91 L.Ed. 754, 767. See also Adler v. Bd. of Education, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517; Poe v. Ullman, 1961, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989; Lathrop v. Donohue, 1961, 367 U.S. 820, 81 S.Ct. 1826, 6 L.Ed. 2d 1191; Communist Party v. Subversive Activities Control Bd., 1961, 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625; Bantam Books, Inc. v. Sullivan, 1963, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584; Railroad Transfer Service, Inc. v. Chicago, 1967, 386 U.S. 351, 87 S.Ct. 1095, 18 L.Ed.2d 143; Currie, Federal Courts 14–17, 46–50 (1968); Bickel, The Least Dangerous Branch 71, 111–198 (1962);

---

1. This is not to say that proof of motive, purpose or intent may not reinforce a finding of racial discrimination or serve as a basis for such a finding. *See* Hall v. St. Helena Parish School Board, E.D. La.1961, 197 F.Supp. 649, aff'd per curiam 368 U.S. 515, 82 S.Ct. 529, 7 L.Ed. 2d 521 (1965); Davis v. Schnell, S.D. Ala.1949, 81 F.Supp. 872, aff'd per curiam 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093; Poindexter v. La. Financial Assistance Comm., E.D.La.1967, 275 F.Supp. 833, aff'd per curiam 389 U.S. 571, 88 S.Ct. 693, 19 L.Ed.2d 780 (1968); Hobson v. Hansen, D.D.C.1967, 269 F.Supp. 401 aff'd *sub nom*, Smuck v. Hobson, 1969, 132 U.S.App.D.C. 372, 408 F.2d 175; Johnson v. Branch, 4 Cir. 1966, 364 F.2d

177; Chambers v. Hendersonville City Bd. of Educ., 4 Cir. 1966, 364 F.2d 189; Downs v. Bd. of Education, 10 Cir. 1964, 336 F.2d 988; Taylor v. Bd. of Education, 2 Cir. 1961, 294 F.2d 36; Brest, Palmer v. Thompson: An approach to the Problem of Unconstitutional Legislative Motivation, 1971 S.Ct. Rev. 95 (1971); Ely, Legislative and Administrative Motivation in Constitutional Law, 79 Yale L.J. 1205 (1970); Note Legislative Purpose and Federal Constitutional Adjudication, 83 Harv.L.Rev. 1887 (1970); Comment, the Constitutionality of Sex Separation in School Desegregation Plans, 37 U.Chi.L.Rev. 296 (1970).

3 Davis on Administrative Law Treatise 116–208 (1958).

⤳The plaintiffs in the instant case have suffered and continue to suffer the actual injury about which they complain. There is no question as to whether the injury will occur, whether the harm will affect these plaintiffs, or whether the Court will have concrete facts before it. This case is "ripe" for adjudication. ⤬

The doctrine of "finality" is a little-used component of the "cases" or "controversies" requirement. The doctrine, traceable to Hayburn's Case, 1792, 2 U.S. (2 Dall.) 409, 1 L.Ed. 436, provides that the federal courts will not act if their decisions are subjected to executive or legislative review. This limitation on "jurisdiction" is a corrollary to the Article III provisions for independence of judges. ⌈The doctrine has no relevance to the instant case.⌋ There is no suggestion that the orders of this Court will be subject to review by other branches. "Finality" is, in a sense, a matter of degree. For example, a money judgment against the federal government can be avoided if the legislative branch chooses to refuse to appropriate money to pay the judgment or a decree of a federal court can have little force if the executive refuses to use its power to enforce it. There is no question of "finality" in the instant case.

The oblique references to "ripeness" and "finality" in the en banc opinion should not be read as an attempt to suggest that an exhaustion requirement exists in a case such as this. Any suggestion that a section 1983 plaintiff must exhaust state administrative or judicial procedures before commencing a federal court suit was buried by the Supreme Court and this Court long ago. *See* Monroe v. Pape, 1961, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492; McNeese v. Bd. of Education, 1963, 373 U.S. 668, 83

S.Ct. 1433, 10 L.Ed.2d 622; Damico v. California, 1967, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647; Houghton v. Shafer, 1968, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319; King v. Smith, 1968, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118; Hall v. Garson, 5 Cir. 1970, 430 F.2d 430; Moreno v. Henckel, 5 Cir. 1970, 431 F.2d 1299.

D. Footnote 1 to the en banc opinion raises the spectre of the alleged "property rights exception" to section 1983 jurisdiction. *See* Hague v. C.I.O., 1939, 307 U.S. 496, 59 S.Ct. 954, 83 L. Ed. 1423 (Stone, J., concurring). The previous cases of this Court have, on their facts, rejected that exception. *See* Hornsby v. Allen, 5 Cir. 1964, 326 F.2d 605; McGuire v. Sadler, 5 Cir. 1967, 337 F.2d 902; Mansell v. Saunders, 5 Cir. 1967, 372 F.2d 573; Barnes v. Merritt, 5 Cir. 1967, 376 F.2d 8; Hall v. Garson, 5 Cir. 1970, 430 F.2d 430.

E. Finally, by requiring the district court to receive and consider a plan for the equalization of municipal services in the town of Shaw, we do not, as Judge Gewin would seem to suggest, indicate any lack of confidence in the ability of the district court, in this or any other case, to fashion a remedy in line with our directives. Rather, we recognize that the planning concept represents a useful tool in situations such as this case. The district court will have the benefit of the ideas and abilities of those who draft the plan as well as those who criticize it. Submission of a plan puts a concrete proposal before the Court and the parties as a focus for discussion and development. ⌈More importantly, the plan as adopted will provide the district court with a device for control of the remedy as well as a standard for measuring compliance⌋ It will also facilitate appellate review. The planning concept is well suited to this case.[2]

---

2. Judge Gewin quotes the opinion in Kennedy Park Homes Assoc., Inc. v. City of Lackawanna, 2 Cir. 1970, 436 F.2d 108 as authority for his view that the form of relief "is for the District Court". In *Lackawanna* the Second Circuit affirmed

the decision of the district court and approved a detailed order as to relief. Here, the district court found for the defendants, we do not have a carefully developed decree to deal with, and the district judge will be forced to start anew.

JOHN R. BROWN, Chief Judge (concurring and concurring in part and dissenting in part to Judge WISDOM's opinion):

I concur in the opinion of the Court and Judge Wisdom's special concurrence as to parts A, B, D, and E. I think, with deference, he overstates "the ripeness", "finality" aspects. The Federal Courts are open for § 1983 redress. But it is to redress wrongs of a city, or a county, or a school board, or a state, not wrongs of the city engineer, the county highway supervisor, or the state director of utilities.

While the State can act only through human functionaries who may bear these titles, still it must be clear that the *body* having responsibility, in response to specific complaints, has for the legal entity involved, failed or refused to take corrective action. The street light in my block may be inadequate, and unequal to another neighborhood, but until I can seek a § 1983 order from a federal Judge, I must at least allow the *city* of Houston to turn me down. This is good sense. It is good federalism. It is good nineteen eighty-threeism.

GEWIN, Circuit Judge (with whom COLEMAN and DYER, Circuit Judges, join, dissenting in part and concurring in part):

I am in substantial agreement with what has been said in sections I and II of the per curiam opinion (the opinion). I respectfully dissent from the expressions in section III wherein the court directs the appellees (defendants) to submit a plan to the district court in order to eliminate the disparities which have been found to exist. The only apparent reason assigned in the opinion for directing the district court to require the municipal authorities "to submit a plan" is the fact that "the matter had received extended attention in the district court." However, the opinion recognizes that under the guidance of the district court,

or voluntarily, much has been accomplished in the Town of Shaw. A biracial committee has been formed to advise the mayor and council with respect to city services, and a black citizen has been elected to the city council.

In my view it would be more desirable to leave the matter of the remedy to the local district judge who is well known for his expertise, fairness, understanding, and unqualified adherence to the requirement that all citizens be accorded equal protection of the laws. Federal appellate courts should exercise utmost care not to be too meddlesome. The mere possession of power does not dictate its use. I hold the confident conviction that the distinguished judge, working in close cooperation with local municipal authorities, can and will remedy the evils which have been found to exist. As the late Mr. Justice Harlan observed in Ohio v. Wyandotte Chemicals Corp., 401 U.S. 493, 91 S.Ct. 1005, 28 L.Ed.2d 256, a federal court should not ambitiously grasp the opportunity to impose its notions of what should be done in every case. In that case the national problem of pollution, obviously one of grave public importance, was involved. The court had jurisdiction of the controversy but it decided not to exercise the power it possessed. The Court concluded:

> What has been said here cannot, of course, be taken as denigrating in the slightest the public importance of the underlying problem Ohio would have us tackle. Reversing the increasing contamination of our environment is manifestly a matter of fundamental import and utmost urgency. What is dealt with above are only considerations respecting *the appropriate role this Court can assume* in efforts to eradicate such environmental blights. *We mean only to suggest that our competence is necessarily limited,* not that our concern should be kept within narrow bounds. (emphasis added)

For an illustration of the use of the planning concept in school desegregation see the extensive litigation culminating in

United States v. Montgomery County, 1969, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263.

401 U.S. at 505, 91 S.Ct. at 1013, 28 L. Ed.2d at 266.

In fashioning the appropriate remedy to be applied, this court should take its cue from Mr. Justice Clark (Ret.) in his opinion in Kennedy Park Homes Assoc., Inc. v. City of Lackawanna, 436 F.2d 108 (2d Cir. 1970), cert. denied 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546. That case is remarkably similar to the case at hand. Speaking for the Second Circuit Mr. Justice Clark stated:

> Even were we to accept the City's allegation that any discrimination here resulted from thoughtlessness rather than a purposeful scheme, the City may not escape responsibility for placing its black citizens under a severe disadvantage which it cannot justify. Norwalk CORE, *supra*; Southern Alameda Spanish Speaking Organization v. City of Union City, California, 424 F.2d 291 (9th Cir. 1970). The City must provide sewerage facilities to the plaintiffs in conformity with the Equal Protection Clause of the Fourteenth Amendment and provide it as soon as it does for any other applicant. Oyama v. California, 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249 (1948). *The particular manner in which this is done is for the District Court.* (Emphasis added).

436 F.2d at 114.

I consider it inappropriate to outline with specificity the relief which the district court may fashion in the exercise of its sound and wise discretion. Indeed, in view of the essentially local nature of the problem presented, the officials of the Town of Shaw can best accomplish the remedial measures necessary. In this case the responsibility, like school boards in desegregation cases, rests primarily with the Town of Shaw and its officials. Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); Brown v. Board of Education of Topeka, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). See also Ohio v. Wyandotte Chemicals Corp., *supra*. It is entirely proper to direct the district court to retain jurisdiction of the case for an appropriate period of time in order to permit the officials of the Town of Shaw to discharge their responsibilities in eradicating prevalent discriminatory practices unfettered and unrestrained by specific appellate court decrees and orders. During such period the actions of the city officials would be subject to the close scrutiny of the district court. If present practices continue without local remedial action, the district court, having retained jurisdiction, should fashion and enforce the necessary remedy. When the district court is satisfied that effective good faith efforts have been made and adequate results achieved, this litigation may be terminated.

This is not the type of case which should continue indefinitely in the federal courts requiring the fashioning of plans, the submission of the same to the court for hearings thereon as to approval or disapproval, resulting in extended litigation and numerous appeals.

RONEY, Circuit Judge (with whom SIMPSON and CLARK, Circuit Judges join, dissenting):

I respectfully dissent because it appears clear to me that this Court has misapplied the established precedents in this case and created an unsound standard of review for matters of this nature.[1]

The Court verbalizes no more for the statistical data submitted by plaintiffs than that it presented a prima facie case of racial discrimination. But then it treats that prima facie case as conclusive proof of a racial classification violative of the Equal Protection Clause which defendants must justify by a compelling state interest.

---

1. Justice Brennan's discussion in Baker v. Carr, 369 U.S. 186 (1962) at p. 217, 82 S.Ct. 691, 7 L.Ed.2d 663, demonstrates the necessity for judicially discoverable and manageable standards for resolving problems which involve political questions.

"Surely, this was enough evidence to establish a prima facie case of racial discrimination. The only question that remains to be examined is whether or not these disparities can possibly be justified by any compelling state interests." Hawkins v. Town of Shaw, Mississippi, 437 F.2d 1286, 1288 (5th Cir. 1971).

Thus the Court entirely forecloses the defendants' opportunity to disprove the prima facie case of racial discrimination by a preponderance of the evidence. The law is clear that before the government action here should have to be justified by a showing of compelling state interest in order to withstand the impact of the Equal Protection Clause, there must first be a finding that the action discriminated against citizens because of their race.[2]

To my mind the En Banc Court, by adopting the position of the original panel, has converted the compelling interest doctrine into a standard of evidence and procedure that has despoiled the processes of law and could well obliterate the truth in a given case. It has confused prima facie evidence of racial classification, which is related to the problems of the shifting burdens of proof and evidence, with a prima facie case of the denial of equal protection, which in racial cases requires justification by a compelling state interest, or put another way, which requires a showing that the condition that results in the "unequal protection" achieves a compelling state purpose.[3]

At the outset it seems to me that we must recognize the inherent uniqueness, in the Equal Protection context, of cases involving those municipal services which require capital expenditures. The provision of municipal services to the property of residents is largely a question of priorities which our system of government conceives should be determined by elected officials responsive to the people. The daily news media well portray the difficulties every city is having in establishing such priorities. It is doubtful that any priority determination could ever be justified on the compelling interest standard as laid down by the cases which fathered the doctrine.[4] In the pro-

---

2. I pretermit any discussion of whether the "compelling interest" equal protection doctrine of "recent vintage," as characterized and analyzed by Justice Harlan in his dissent in Shapiro v. Thompson, 394 U.S. 618 (1969), pp. 658–663, 89 S.Ct. 1322, 22 L.Ed.2d 600, could appropriately be applied in a municipal service case on the "suspect" criterion of wealth, Harper v. Virginia Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) or on a "fundamental right" theory, Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) and Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) [right to vote]; Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) [right to marry and procreate]; Shapiro v. Thompson, supra [right to interstate travel]; Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) and Douglas v. Illinois, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) [right to have criminal hearings]. This case has been presented to us solely on the basis of racial classification. That is all that the evidence addressed itself to, although the complaint asserted both race and poverty as grounds for relief.

3. Cf. Coleman v. Alabama, 389 U.S. 22 (1967) at p. 23, 88 S.Ct. 2, at p. 3, 19 L.Ed.2d 22: "This 'testimony in itself made out a prima facie case of the denial of the equal protection which the Constitution guarantees.' Norris v. Alabama, 294 U.S. 587, 591 [, 55 S.Ct. 579, 581, 79 L.Ed. 1074.] In the absence of evidence adduced by the State adequate to rebut the prima facie case, petitioner was therefore entitled to have his conviction reversed. Arnold v. North Carolina, 376 U.S. 773 [, 84 S.Ct. 1032, 12 L.Ed.2d 77;] Eubanks v. Louisiana, 356 U.S. 584 [, 78 S.Ct. 970, 2 L.Ed.2d 991;] Reece v. Georgia, 350 U.S. 85, 87–88 [, 76 S.Ct. 167, 169, 100 L.Ed. 77;] Hernandez v. Texas, 347 U.S. 475, 481 [, 74 S.Ct. 667, 671, 98 L.Ed. 866;] Hill v. Texas, 316 U.S. 400, 406 [, 62 S.Ct. 1159, 1162, 86 L.Ed. 1559.]"

4. McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964); Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); Jackson v. Godwin, 400 F.2d 529 (5th Cir. 1968); Harper v. Virginia Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); Baker v. Carr, 369 U.S.

'vision of streets, sewers, lights, water and other facilities, given limited resources, the city simply has to start with something some place. As municipal improvements are originated, installed, repaired, improved and modernized, it is intrinsic to the process that at any given point of time services will be unequal, a condition which probably does not serve any compelling interest.[5] While there could be no compelling state interest in starting with the provision of services in the white areas of a town with segregated neighborhoods, neither could there be a compelling state interest to start any other particular place. Even if there is a compelling reason for a given priority, it is questionable, if this is tantamount to a compelling state interest.[6] For the law to require that the town must show a compelling interest to justify the priorities it establishes in making capital improvements simply requires the impossible. For the Courts to assume control of those priorities merely results in substituting one non-compelling list of priorities for another.

This is not a case where equality can be obtained by invalidating a law or re-ordering human conduct, or even by reallocating the expenditure of a pool of current operational funds. The difference is more than a problem of remedy. It goes to substance. Disparity is the necessary result of the limiting factors of resources and time.

This is not to say that § 1983 does not provide an avenue for relief against unconstitutional action in the rendition of municipal services, but an understanding of the problems of priorities must serve as a backdrop for the application of the Equal Protection Clause and for judicial consideration of whether those being served unequally are the victims of constitutionally impermissible state action. The difference must be recognized in deciding the precedential value of prior cases. Legal principles which serve well in the one case, may not in another.

The determination to apply the compelling state interest test dictates the result for all practical purposes. Since any stop-action picture of the progressive urban process is almost certain to show disparity in municipal services, it is incumbent upon us to determine precisely whether that disparity is the result of action intended for proscription by the Equal Protection Clause *before* it is submitted to the compelling interest test. The necessity for care is highlighted by the fact that the remedy sought by the plaintiffs, and granted by the En Banc Court, causes irreparable damage to the fundamental right of the citizens of Shaw to govern themselves.

I cannot agree to a holding which establishes as a principle of law that a court is required to apply the compelling state interest test to a mere prima facie case of racial classification in the distri-

---

186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); and Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942).

5. A fully mature city with stable population which can resist the current trend to expansion of corporate limits, might approach equality on a quantitative basis but continued modernization will probably necessitate qualitative inequality. It can be fairly assumed from the record that Shaw will continue its progress to the point where all citizens will have adequate, if not exactly equal, municipal services of the kind involved in this lawsuit. Modern street paving did not begin until 1960. Prior to 1963, the town had no municipal sanitary sewer services. We

are told that a federal grant has been approved to resolve the problem with regard to water pressure and fire hydrants.

6. Compare Hadnott v. City of Prattville, 309 F.Supp. 967 (M.D.Ala.1970) where the system of property assessment used as the determining factor for installation of municipal services virtually compelled the priorities, thus disproving the prima facie case of disparity based on race, with Serrano v. Priest, 5 Cal.3d 584, 96 Cal. Rptr. 601, 487 P.2d 1241 (1971) and Van Dusartz v. Hatfield, 334 F.Supp. 870 (D.C.Minn. 10-12-71) where the states could not show a compelling state interest in a system of financing which was equally coercive in determining educational priorities but resulted in disparities based on wealth.

bution of municipal services requiring capital expenditures. Such a principle permits the Equal Protection Clause to swallow the entire system of political democracy in state and local government on a procedural determination.

## II.

( The plaintiffs' proof consisted almost solely of statistical evidence of a disparity between races in the provision of municipal services requiring capital expenditures. )

The principle that figures will speak persuasively in court was evolved in cases where it was clearly demonstrated that the figures would differ were it not for racial discrimination.[7] There was some reasonable basis on which to judge what the figures would have been or what they would not have been absent racial discrimination.

In this case, no comparative base was submitted in evidence or argued as a matter of law, nor has the Court reasoned against any hypothetical base. Nor does experience lead to a clear conclusion. There are many towns across America with no racially identifiable neighborhoods that have great disparities in municipal services—so the fact of disparity alone does not point to racial discrimination. There is no indication that were it not for racial discrimination the municipal services would fall proportionately upon black and white, or even substantially so. With the limited resources of Shaw and the conservative improvement policy followed for all of its citizens, there is no reason to believe that at this point in time everyone would have equal services, absent racial discrimination. Taking notice that disparity of services is typical of many non-segregated towns otherwise like Shaw, there is some reason to believe that without regard to race, if the plaintiffs were of low income, with the social, economic, educational and political characteristics which the scant record would indicate, they would be among those who would suffer from the disparity of services in any town with no racial differences among its citizens.[8] While this may be of little comfort to the man without a street, or a sewer, and with poor drainage and a poor water supply, it is nonetheless significant to our review of this case because we are asked to accept the statistics as conclusive proof of *racial* discrimination contrary to all other reasons for disparity in order to trigger the compelling state interest test. To reverse on the figures alone would seem to require the exclusion of every reasonable hypothesis except that asserted by the plaintiffs.

## III.

( Placing the statistics in proper perspective, we are then bound by the clear-

7. Brooks v. Beto, 366 F.2d 1 (5th Cir. 1966) [Not a single Negro grand juror ever served in a county with 10% Negro population.]
   Alabama v. United States, 304 F.2d 583 (5th Cir. 1962), aff'd, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112 [Less than 10% of the Negroes of voting age were registered to vote. Although Negroes made up 83% of the population, they constituted only 25% of the registered voters.] United States ex rel. Seals v. Wiman, 304 F.2d 53 (5th Cir. 1962), cert. den., 372 U.S. 915, 83 S.Ct. 717, 9 L.Ed.2d 722 [Negroes constituted more than 31% of those qualified for jury service but less than 2% of those on the jury rolls.] United States v. Edwards, 333 F.2d 575 (5th Cir. 1964) [Negroes made up 37.3% of the population but constituted less than 1% of the registered voters.] United States v. State of Mississippi, 229 F.Supp. 925 (S.D.Miss.1964), rev'd 380 U.S. 128, 85 S.Ct. 808, 13 L.Ed.2d 717 [Only 5% of Mississippi's adult Negro population was registered to vote.] Bing v. Roadway Express, Inc., 444 F.2d 687 (5th Cir. 1971) [Among the almost 300 road drivers hired by the company, there was not a single Negro.] United States v. Ironworkers Local 86, 443 F.8d 544 (9th Cir. 1971) [Of some 3720 union members only 3 were black.]

8. Although poverty was asserted as an improper classification in the court below, the record is virtually silent on the point, and the argument was dropped on appeal.

ly erroneous standard of review provided by Rule 52(a), F.R.Civ.P. Although we have held that we are free from the restraining impact of the clearly erroneous rule where the ultimate fact is simply the result reached by processes of legal reasoning from, or the interpretation of the legal significance of the evidentiary facts,[9] the facts concerning the rendition of municipal services by Shaw are simply not of that kind. The complex social, economic, scientific, geographical, and political input required in order to establish priorities in the expenditure of public funds casts the determination as to those priorities into a mold differing substantially from the kind of ultimate fact to which that rule addresses itself. Here the district court not only heard all the testimony but personally viewed the whole Town of Shaw. His findings of fact should not be disturbed on review unless clearly erroneous.

### IV.

It being virtually impossible to make priority determinations in terms of compulsion, a rational justification is all that can be required to meet the prima facie factual case. Although the law is clear that in the face of figures which indicate a prima facie case of racial discrimination the Court will not accept general assertions by public officials of non-discrimination but must look to other evidence, Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935); Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1953), that evidence need not be of a compelling nature. In a case of this kind it should be sufficient to meet the prima facie case of racial discrimination that the actions of public officials rested upon rational considerations, irrespective of race. This is the standard that was applied by the trial judge.

A fair evaluation of the evidence read against the findings of the trial court, as set forth in detail in his Memorandum Opinion, Hawkins v. Town of Shaw, Mississippi, 303 F.Supp. 1162 (N.D.Miss. 1969), does not permit reversal under the clearly erroneous standard of review. We must view the evidence in the light and with all reasonable inferences most favorable to the judgment below. Wheeler v. Holland, 218 F.2d 482 (5th Cir. 1955); Firemen's Insurance Company of Newark, New Jersey v. Robbins Coal Company, 288 F.2d 349 (5th Cir. 1961), cert. den. 368 U.S. 875, 82 S.Ct. 122, 7 L.Ed.2d 77 (1961); cf., Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir. 1969). That we might reach a different conclusion as a trier of fact does not justify reversal on review. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

### V.

Needless to say, if this case decides that there is a *constitutional right in every citizen* regardless of race *to equal municipal services*, as indicated in Judge Wisdom's concurring opinion, much time is being wasted in considering the race of those who have unequal services. The disparity as to race would be irrelevant. If everyone has a constitutional right to equal services then the class broadens to include both races, because in Shaw there are both whites and blacks who have less than equal municipal services of various kinds. It would make no difference then what the race of the citizen without the service. However, I do not understand the Court to have so based its decision nor was that principle asserted by the plaintiffs in this case. The correct principle would appear to be that every citizen has a right not to be denied services because of race, and that any denial of services must have occurred only as a result of the nonracial resolution of all of the competing influences in the politics of self-government.

A contrary disposition of this case, either as to liability or remedy is not indicated by such cases as Norwalk CORE v. Norwalk Redevelopment Agency, 395 F. 2d 920 (2nd Cir. 1968), Kennedy Park

---

**9.** Galena Oaks Corporation v. Scofield, 218 F.2d 217 (5th Cir. 1954).

Homes Association, Inc. v. City of Lackawanna, New York, 436 F.2d 108 (2nd Cir. 1970), or Hadnott v. City of Prattville, 309 F.Supp. 967 (M.D.Ala.1970).

*Norwalk* was decided on pleadings directed to a specific urban renewal project that alleged a denial of equal protection to Negroes and Puerto Ricans displaced by the program. Presumably proof of these allegations would precede the application of the compelling state interest test.

*Kennedy Park Homes* affirmed lower court findings, fully supported by a record, that racial motivation resulted in depriving plaintiffs of the use of property for a housing project by denying them sewers. It was only after this finding that the compelling state interest test was applied.

*Hadnott* simply permitted evidence of rational reasons for disparity to overcome the prima facie case of discrimination in all the municipal services except in a public park, in which, by the same standard of proof, discrimination was found.

### VI.

In devising a remedy, as well as deciding liability, this Court has adopted a doctrine of "proportional protection" to supersede the constitutional mandate of equal protection. This case would indicate that if each municipal service is provided to an equal percentage of both races, Shaw would not then "deny to any person within its jurisdiction the equal protection of the laws." This approach has no authoritative precedent. The "equalization" directed by the Court may or may not remedy the effects of racial discrimination and bring Shaw into constitutional line. Such a remedy goes to the evidence of discrimination rather than to its effect.

Even if I agreed with the Court that the plaintiffs are entitled to relief, I would remand the case to the district court for the purpose of taking such additional evidence as may be necessary to make findings as to exactly what services would now be in place were it not for

racial discrimination, and for the purpose of then devising appropriate remedies directed only to the proven effects of the constitutional violation and to protection against future violations.

CLARK, Circuit Judge (with whom SIMPSON, Circuit Judge, joins, dissenting):

The en banc court's reaffirmance of the original panel opinion embarks this circuit on what must surely become another weary journey to an inefficient and insufficient remedy for a problem that cannot find a solution in the courts. Judge Wisdom is right when he observes in concurring that the Town of Shaw does not present a unique case. Rather, Shaw is typical of thousands of towns and hundreds of cities in this nation. An examination of any urban gathering of people will highlight the inequalities among the places where they live. The degree of affluence or poverty of each family in the community is almost uniformly reflected in its home. Whether one counts it good or bad, such variance in living standards is a hallmark of our American liberty. It inheres in every free society. Only in some egalitarian Utopia do all families live in equal surroundings. A failure to recognize this fact is at the heart of the mistake the court makes in choosing the course it launches today.

As Judge Roney aptly demonstrates in Part III of his dissent, the clearly erroneous rule applies here. The District Judge was not clearly wrong in refusing to base his findings upon statistics cast into a racial mold. In essence, he found that because the people of the Town of Shaw had living standards that varied according to their individual financial conditions and social values, some of them occupied properties which required and permitted a lower level of municipal service than other properties. These dissimilarities in need and demand formed the basis of his finding that the city fathers had not discriminated against inhabitants on the basis of race, either deliberately or through arbitrary thought-

lessness. That this approach is not in error has been clearly recognized by the plaintiffs through their abandonment on this appeal of a principal basis of their contest before the trial court—that discrimination was based upon wealth. For at least in the municipal service context, the poverty claim is incompatible with racial distinctions.]

An overview of this case shows that the trier of fact looked at the physical characteristics of the municipal services provided to the inhabitants of the Town of Shaw and concluded that the actions of its public officials in providing governmental services to the various property owners within its corporate limits rested upon rational considerations of the varying physical factors involved—irrespective of race; on appeal this court saw only that these disparities could be grouped by race to show more Negroes than whites received lesser municipal services. From this statistical possibility this court concluded that the trial court was in error. Yet, in reaching its determination, the district court expressly acknowledged its study and consideration of the very same racially compartmented statistical information which the en banc court finds decisive. The difference is that the lower court refused to ignore the dissimilar situations of geography, housing patterns, antiquated streets, limited finances and the existence of a conservative, unprogressive municipal policy in resolving the basic issue of whether plaintiffs proved unconstitutional discrimination by the defendants.

The district court's determination that racial discrimination was not a basis for the lack of equality in municipal services throughout the Town of Shaw is supported in this record by substantial rational considerations which explain the quality and quantity of present municipal functions. It is plain error on our part to upset this factual support for the district court's decision solely because of the plaintiffs' ability to cast these disparities into a racial mold. The economic and

sociological problems that under-lie why the preponderant number of black citizens of Shaw, Mississippi are poorer than the whites who live there are facts of life, albeit uncomfortable ones for a nation concerned with social justice. However, these statistics alone no more demonstrate constitutionally impermissible racial discrimination in providing civic support by Shaw, Mississippi than would the same readily made showing in Chicago, Illinois or Los Angeles, California or Houston, Texas or Newark, New Jersey. They cannot be combined with the ever-present fact that the less well-developed areas of every urban community receive a lower level of many municipal functions to make out a case for racial discrimination where there is none.

What's worse, this travel toward a false hope starts on the wrong foot. The district court is incorrectly faulted for applying an erroneous legal standard. This holding simply will not withstand impartial analysis as Judge Bell demonstrated in the second paragraph of his original concurring opinion at 437 F.2d 1293, 1294. See also Judge Roney's dissent. The opinion of the district court is expressly based on correct legal precedent. Any reversal should necessarily have been based upon our demonstration of a clearly erroneous resolution of the facts. That this is the correct approach may be at least tacitly conceded by the panel opinion which the en banc court adopts, since that opinion spent far more than a majority of its length in attempting to rationalize factual inferences different from those reached by the trial court.

Another symptom of the error which pervades the court's approach appears in the sentence from the majority en banc opinion which declares:

Moreover, in our judgment the facts before us squarely and certainly support the reasonable and logical inference that there was here neglect involving clear overtones of racial discrimination in the administration of

governmental affairs of the town of Shaw . . . . (Emphasis mine.)

The mere fact that the court believes "support" can be found in the appellate record for drawing a differing inference of fact from that drawn by the district court does not justify reversal. In order for the district judge to be wrong on the facts, this court must be able to say that the record before us demonstrates the contrary finding of the district court to be clearly erroneous. On this same point, the panel opinion which the en banc court affirms, stated: " . . this court has *adequate standards to determine fairly* that municipal services have been allocated in a discriminatory manner." This likewise says far too little. A determination of the existence of "adequate standards to determine fairly" that a fact finding could be wrong does not provide the basis for an appellate reversal on the facts. A careful analysis demonstrates that this court has simply taken the same misleading statistical approach tendered by the plaintiff which the district court rejected, and has erroneously arrived at a finding of fact different from that made by the court vested with this responsibility.

In remitting Mr. Hawkins and the members of his class to a solution at the ballot box, rather than dangling the carrot of reform by judicial injunction before them, the district court followed the course of wisdom and practicality. Hard reality fore-ordains that no plan can be devised which will solve the complex variables of "equalizing" municipal services. This court's broad-brush approach to this case guarantees such a fruitless result. By generally describing the service areas the court uses to justify overturning the district court's fact finding, this court has multiplied the problems for the planning function it requires, if it has not rendered it impossible. Shaw's resources are finite. Its daily needs must be met by public servants who must anticipate long-range requirements, both for the handful of classes of projects specifically dealt with and also for that wide spectrum of services and facilities that aren't even mentioned. Our opinion leaves too many areas in these classes too wide-open to permit intelligent planning. While requiring city officials to devise and the district court to approve a program to "eliminate the disparities," we not only give no real guidance as to what is expected but create impediments to the development of effective programs in the areas we discuss.

For example: As to paving—Does the court intend for the city to pave enough of the streets of inadequate width in the areas inhabited by Negro citizens to equal the length of similar narrow streets which were paved in white neighborhoods in the 1930s, or should Shaw now plan to condemn sufficient property in Negro neighborhoods to construct a modern street system in those areas?

As to sanitary sewers—Can the city comply with our wishes by constructing sanitary sewerage collection lines to houses having no indoor plumbing, or must the city adopt a "proper housing code"?

As to surface drainage—Is it sufficient for the city to construct surface water drainage structures in lowlying areas which will be equal to the drainage structures in other areas of the city; or must some new legal route be found to empower the city to engage in the major channel improvement and dredging outside its city limits which the district court found was the real key to elimination of flooding in these areas of this essentially flat town; or will the city be required to undertake land fills in the lower areas to correct these deficient elevations?

As to water mains—Must water supply mains be sized on a present house count basis to reach equality, or may they be sized on the basis of anticipated demand for water? Here again, we ought to be explicit as to whether a new housing code is required that would mandate more residential water using facil-

ities, *i. e.* sinks, tubs and toilets. Now is also the time the city should be advised of the place in any plan's list of priorities for the proposed construction of the new water storage tank and large water well which this litigation has already delayed by two years.

On a broader basis as to all required plan ingredients, the court should certainly now make explicit whether our *criterion is to be proportionately adequate service to the town's individual parcels of property as they are now developed;* or equal service based upon the race of the property occupants; or something yet different from these.

While Lynch v. Household Finance Corp., 405 U.S. 538, 92 S.Ct. 1113, 30 L.Ed.2d 424, decided March 23, 1972, renders any distinction academic for jurisdictional purposes, there is absolutely no way to escape the conclusion that this is purely a property rights case. It is a property right which requires the municipal service in nearly every instance brought out by this record and, interestingly enough, we have no information as to the race of the owner of the properties involved, only the race of the occupants. A novel situation indeed would exist if our plan required the city to furnish municipal services to a parcel of property that the property owner did not want and could not afford to utilize. Yet this result is not only possible, it is probable here.

In our haste to mandate that all things in Shaw become equal, we ought to pause to realize that we require changes in living patterns and property utilization *that the individual property owners cannot afford to use.* At the same time, under the generalized approach adopted, the plan could wind up failing to bring meaningful improvements to the very parties who brought this action. These observations are meant only to highlight the need for approaching and finding solutions for such property problems on a specific rather than a wholesale basis. We err in adopting the analogy that equalization of municipal services is akin to school desegregation or to jury dis-

crimination and holding that the simple way to perfect a remedy is to require the town to develop a program to "eliminate the disparities."

For all of these reasons and those set out by Judge Roney, in which I concur, I dissent.