RAILROAD TRANSFER SERVICE, INC. *v.* CITY
OF CHICAGO ET AL.

No. 209.   Argued February 13, 1967.—Decided March 27, 1967.

*Amos M. Mathews* argued the cause for petitioner. With him on the briefs was *David Axelrod.*

*Raymond F. Simon* argued the cause and filed a brief for respondents.

*Joseph H. Hays, James W. Nisbet, Ed White* and *J. D. Feeney* filed a brief for Chicago Terminal Railroads, as *amicus curiae,* urging reversal.

MR. JUSTICE BLACK delivered the opinion of the Court.

This case arises from more than a decade of controversy between Railroad Transfer Service, Inc., and the City of Chicago over the city's persistent efforts to regulate Transfer's business, under contract with the railroads, of daily transporting by motor vehicle thousands of interstate railroad passengers between the city's rail terminals. In 1955 the railroads hired Transfer to replace another motor carrier in performing this interterminal transfer service. Bent on blocking this replacement, the city then amended Chapter 28 of its Municipal Code, which had before been primarily directed at regulating taxicab companies, to require that new companies seeking to perform the transfer service obtain licenses from the city by demonstrating, among other things, their ability to satisfy the public convenience and necessity. Because the city threatened to fine Transfer and arrest its drivers if it operated without a city license for each vehicle, Transfer, without attempting to obtain such licenses, and the rail-

roads brought suit against the city to challenge the valid-ity of the public-convenience-and-necessity section of the ordinance. In *Chicago* v. *Atchison, T. & S. F. R. Co.,* 357 U. S. 77, rejecting the city's argument that the challenge was premature, we held that section "completely invalid insofar as it applies to Transfer . . . ." *Id* at 89.

In 1959, after our decision in *Atchison,* the city repealed the invalid section, added some new provisions, and amended or left unchanged others which clearly applied to Transfer but were not specifically dealt with in our *Atchison* opinion. The amended ordinance, still making it unlawful for Transfer to operate without obtaining licenses from the city,[1] provides that an applicant for a license must, among other things:[2] pay a license fee,[3] hire only Chicago residents as its drivers,[4] maintain its principal place of business in Chicago,[5] and file a detailed

---

[1] § 28–2. (The provisions herein cited are from the current Municipal Code.)

[2] No vehicle may be licensed until it has been inspected by the city and found to be "in safe operating condition and to have adequate . . . facilities which are clean and in good repair for the comfort and convenience of passengers" (§ 28–4), unless it has at least two doors on each side (§ 28–4.1), and unless the licensee has a specified amount of public liability, property damage, and work-men's compensation insurance evidenced by policies filed with the city (§ 28–12). The validity of these provisions is not specifically challenged by Transfer.

[3] Section 28–7 imposes an annual fee of $40 for each terminal vehicle, clearly defined in § 28–1 (p) to include Transfer's vehicles, and provides that such fee "shall be applied to the cost of issuing such license, including, without being limited to, the investigations, inspections and supervision necessary therefor, and to the cost of regulating all operations of public passenger vehicles . . . ."

[4] Provisions of Chapter 28 require that drivers be public chauffeurs licensed by the city, §§ 28–1 (*l*), 28–9, and several provisions of Chapter 28.1 appear to make residence in the city a condition to being licensed as a chauffeur, *e. g.,* §§ 28.1–3, 28.1–9, and 28.1–14.

[5] Section 28–5.1, added for the first time in 1959.

written application.[6]  Upon receipt of an application, the city must investigate the applicant's "character and reputation . . . as a law abiding citizen" and his "financial ability" to render "safe and comfortable" service, to replace and maintain equipment, and to pay all judgments arising out of vehicle operation.  If the city finds that the applicant is "qualified" and that the vehicle for which the license is sought is in "safe and proper condition," the amended ordinance requires the city to issue the license.[7]  Licenses are valid for only one year, and

---

[6] Section 28-5, describing the information to be contained in the application, was amended in 1959 to provide:

"If the applicant is affiliated or to become affiliated or identified with any person [defined elsewhere to include a corporation] by . . . service agreement, the application shall contain the full name, Chicago business address and telephone number of said affiliate, and a copy of the agreement with said affiliate, if any, shall be filed with the application."

Since Transfer operates under a service contract with the railroads, it is conceivable that the railroads might be considered affiliates of Transfer.  However, it is clear that the provisions of the ordinance requiring an affiliate to maintain its principal place of business in Chicago, to register with the Commissioner, to carry certain insurance, and to comply with all provisions of the ordinance and rules issued by the Commissioner, §§ 28-5.1, 28-12.1, 28-13.1, cannot be validly applied to the railroads, and the city does not now suggest that they can.

[7] § 28-6:

"Upon receipt of an application for a public passenger vehicle license the commissioner shall cause an investigation to be made of the character and reputation of the applicant as a law abiding citizen; the financial ability of the applicant to render safe and comfortable transportation service, to maintain or replace the equipment for such service and to pay all judgments and awards which may be rendered for any cause arising out of the operation of a public passenger vehicle during the license period. *If the commissioner shall find that the application, and all other statements and documents required to be filed with said application have been properly executed, and that the applicant is qualified to pursue the occupation*

under the amended ordinance a licensee must annually go through this detailed application procedure. 'Outstanding licenses are revocable on a number of grounds at the city's discretion.[8] Finally, the ordinance provides a fine of up to $100 for each violation of any of its provisions and specifies that each day such violation continues shall be deemed a separate offense.[9]

With the ordinance thus amended, the city in 1960 demanded that Transfer apply for licenses. Transfer did so, after unsuccessfully attempting to pay the license fees under protest, and then brought this present lawsuit against the city, asking the District Court to declare the above-mentioned provisions of the ordinance invalid as unconstitutional burdens on interstate commerce and as unconstitutional attempts to regulate in an area pre-empted by the Interstate Commerce Act, 24 Stat. 379, as

---

*of a cabman or coachman* [defined in § 28–1 (m) to include the proprietor of a terminal vehicle], *the commissioner shall issue to him and in his name a license for each public passenger vehicle applied for, to terminate on the 31st day of December following the date of issue, provided that each said vehicle is registered in applicant's name and is in safe and proper condition at the time the license is issued."* The italicized sentence was added in 1959.

[8] Prior to 1963 a license was subject to discretionary revocation only if it was obtained by an application in which a material fact was omitted or stated falsely. § 28–15.1. This section was amended in 1963 to authorize revocation also where a licensee fails "to carry out any representation made to the Commissioner before the issuance of such license," and to make clear that revocation under this section may extend to *all* licenses held by a person who obtains any single license by misrepresentation.

Under § 28–14, the city's vehicle commissioner may suspend a license at any time that a vehicle becomes "unsafe for operation or . . . unfit for public use," and "[i]n determining whether any . . . vehicle is unfit for public use the commissioner shall give consideration to its effect on the health, comfort and convenience of passengers and its public appearance on the streets of the city."

[9] § 28–32.

amended, 49 U. S. C. § 1 *et seq.* While the case was pending, the city again demanded that Transfer cease and desist operations unless it "fully complied" with the ordinance [10] and again amended its ordinance to impose new requirements on Transfer such as filing detailed financial reports and opening its books and records for city inspection.[11] Nevertheless, the District Court dismissed Transfer's action as premature. Because Transfer had continued to operate by paying its license fees into court and because the city had taken no further action to enforce its ordinance, the Court of Appeals affirmed, holding Transfer's complaint premature and the ordinance valid

---

[10] The city also ordered Transfer's drivers to submit to medical examinations and fingerprinting.

[11] § 28–30.1:

"Every cabman, *corporation* and affiliate shall keep and provide accurate books and records of account of his operations at his place of business in the city. On or before May 1 of each year, every cabman, *corporation* and affiliate shall file with the Commissioner a profit and loss statement for the preceding calendar year, showing all his earnings and expenditures for operation, maintenance and repair of property, depreciation expense, premiums paid for workmen's compensation and public liability insurance, and taxes paid for unemployment insurance and social security, and all state and local license fees, property taxes and Federal income taxes, and a balance sheet taken at the close of said year.

"The Commissioner . . . shall have access to the property, books, contracts, accounts and records during normal business hours at said place of business, for such information as may be required for the effective administration and enforcement of the provisions of this chapter . . . .

"*In addition to the foregoing reports, each cabman shall within thirty days after the six months' period ended December 31 and within thirty days after the six months' period ended June 30 of each year file a sworn statement with the Commissioner showing his gross fares collected and his operating expenses for the six months immediately preceding said dates.*"

The italicized provisions were added in 1963. As first enacted in 1959, the section was applicable only to taxicab companies.

on its face. 358 F. 2d 55. We granted certiorari to consider these two holdings and conclude that the action is not premature and that the ordinance is invalid.

*First.* The prematurity arguments which the city makes here are similar to the ones it made and we rejected in *Atchison.* Though the city argues that some of the challenged provisions of the ordinance do not apply to Transfer,[12] the Court of Appeals clearly considered them applicable. Though the city argues that it does not retain as much power to deny Transfer a license as Transfer fears,[13] it is clear that "the City claims *at least some power* . . . to decide whether a motor carrier may transport passengers from one station to another." 357 U. S., at 85 (emphasis added). That was enough in *Atchison* to enable Transfer to attack the public-convenience-and-necessity requirement, even though the city there disclaimed any power to deny a license because of economic considerations. It is enough here. It is difficult to imagine a controversy more actual, alive, and ripe than this one. It has lasted for more than a decade. Though Transfer obtained its 1960 licenses after it filed this lawsuit to challenge the ordinance, it has continued to operate only by paying the license fees into court. The city has continually—and even while this case was pending—amended its ordinance to regulate Transfer further

---

[12] For instance, the city argues that § 28–30.1 does not apply to Transfer. But, as the Court of Appeals apparently recognized, the 1963 amendments of this section make its first two paragraphs applicable to Transfer. See note 11, *supra.*

[13] The city argues that its commissioner may only consider the so-called "safety factors" specifically enumerated in § 28–6 in determining whether Transfer is "qualified" to perform the interterminal service. See n. 7, *supra.* Transfer, perhaps understandably, is afraid that the word "qualified" gives the commissioner unlimited discretion to consider the very same nonsafety factors that he previously could consider under the invalid public-convenience-and-necessity provision.

and has continually demanded that Transfer fully comply with the ordinance. Though the city now disclaims any power to "stop" Transfer's operations, it does not give up its power under the ordinance to fine Transfer and arrest its drivers for operating without licenses or its power to revoke for discretionary reasons all licenses which Transfer may obtain.[14] In short, although Transfer continues to operate, it is only at the city's reluctant sufferance.[15] If the ordinance is invalid insofar as it applies to Transfer, then, as we said in *Atchison*, "that company was not obligated to apply for a . . . [license] and submit to the administrative procedures incident thereto before bringing this action." 357 U. S., at 89.

*Second.* The rationale of *Atchison* compels our holding that the provisions of the ordinance now challenged by Transfer cannot be validly applied to it. In *Atchison*, recognizing that Transfer's "service is an integral part of interstate railroad transportation authorized and subject to regulation under the Interstate Commerce Act,"

---

[14] At the same time the city was assuring the District Court that its threat to stop Transfer was an "idle" one, it was adding a new provision to the ordinance which seems custom-tailored to make Transfer's already precarious position more precarious. Section 28–31.2, added in 1963, provides:

"No license which has been revoked, surrendered, cancelled or not applied for within a period of seven months after such license application is due, shall hereafter be issued."

[15] The city argues that Transfer cannot challenge the principal-place-of-business requirement because Transfer now has its principal, and only, place of business in Chicago. The provision quoted in n. 14, *supra*, makes it clear that neither Transfer, which might want to change its place of business, nor the railroads, which might want to hire another transfer agent or perform the service themselves, can afford to make any change prior to challenging the place-of-business requirement. Under § 28–15, "[i]f any licensee abandons his . . . place of business in the city . . . all his licenses shall be revoked." After such revocation, no new licenses may be issued.

*id.*, at 89, we pointed to various provisions of the Act [16] which in our view completely precluded the city "from exercising *any veto power* over such transfer service," *id.*, at 85 (emphasis added). The Act, as we said in *Atchison*, gives the railroads, not the city, the "discretion to determine who may transfer interstate passengers and baggage between railroad terminals." *Id.*, at 84–85. That power, that discretion, is precisely what the comprehensive licensing scheme of the amended ordinance purports to reserve to the city. It matters not that the city no longer seeks to exercise that power by requiring a showing of public convenience and necessity. The total effect of the current ordinance on Transfer's operations and the burdens it places on interstate commerce are the same. As we recognized in *Atchison*, the city retains authority to insist that Transfer obey "general safety regulations" such as traffic signals and speed limits. *Id.*, at 88. Many of the provisions of the current ordi-

[16] In particular, we mentioned 49 U. S. C. §§ 1 (4) and 3 (4) requiring the railroads to provide reasonable and proper facilities for the transfer of passengers between terminals, § 15 (3) giving the Interstate Commerce Commission power to establish such service, and § 302 (c)(2) providing that the interterminal service conducted by any motor carrier under contract with a railroad shall be regarded as transportation performed by the railroad and shall be subject to the same comprehensive scheme of regulation which applies to such transportation. Furthermore, under a proviso of § 302 (c), the ICC retains power to treat interterminal service as motor carrier service under § 304 for the purpose of regulating "qualifications and maximum hours of service of employees and safety of operation and equipment."

Although, at the time we decided *Atchison*, the ICC had not adopted any special regulations for interterminal transfer service, we there noted that it could do so at any time under the Act, *id.*, at 86–87, and since then, the ICC has, indeed, promulgated under § 304 certain safety regulations which are specifically applicable to motor carriers engaged in such service. See generally 49 CFR § 190.1 *et seq.*

nance, such as the requirements that Transfer maintain its principal place of business in Chicago, have its drivers reside in Chicago, file annually the most detailed financial reports, and open its books and records for city inspection, bear no resemblance to general safety regulations such as traffic signals and speed limits. Other provisions, if standing alone and enforced by means other than this particular licensing program, might possibly be justified as safety regulations.[17] *Castle* v. *Hayes Freight Lines,* 348 U. S. 61. But we need not decide that question now, for here each of these provisions is an integral part of, and cannot be divorced from, the comprehensive licensing scheme that the city seeks to impose as a whole on Transfer. See *Adams Express Co.* v. *New York,* 232 U. S. 14. Here the city seeks to enforce each and all of these related requirements by denial of a license for noncompliance and then criminal sanctions for operation without a license. This is the "veto power" which *Atchison* held the city may not exercise.

*Reversed.*

MR. JUSTICE HARLAN would affirm the judgment below substantially for the reasons given in the opinion of Chief Judge Hastings for the Court of Appeals, 358 F. 2d 55.

---

[17] In *Atchison* we noted that the city retains authority to "exact reasonable fees for . . . use of the local streets." *Id.,* at 88. The license fees exacted here, however, were for the purpose of enforcing this invalid licensing scheme. See note 3, *supra.* Transfer cannot be compelled to pay them.