**AAACON AUTO TRANSPORT, INC.,**
**Plaintiff-Appellant,**

v.

**Anson D. MEDLIN et al.,**
**Defendants-Appellees.**

**No. 76–2601.**

United States Court of Appeals,
Fifth Circuit.

June 26, 1978.

Rehearing and Rehearing En Banc
Denied Sept. 5, 1978.

Michael G. Ames, Ralph J. Zola, New York City, for plaintiff-appellant.

Richard B. Austin, Miami, Fla., for Medlin et al.

Before CLARK and GEE, Circuit Judges, and LYNNE,* District Judge.

GEE, Circuit Judge:

This is a private enforcement action brought under section 222(b)(2) of the Interstate Commerce Act, 49 U.S.C. § 322(b)(2) (1970), to enjoin the interstate transportation of automobiles and persons without a certificate of public convenience and necessity. Plaintiff, Aaacon Auto Transport, is a common carrier licensed by the ICC; it operates an automobile driveaway service, arranging for the transportation of cars through so-called "casual drivers," who wish to defray travel expenses by driving someone else's car to their destinations. The principal defendant is Anson Medlin,[1] who buys and sells used cars in Miami, Florida. Medlin is accused of encroaching upon Aaacon's business by using casual drivers to ship automobiles for two used car dealerships, one in Virginia and the other in California. The court below granted defendants' motion for summary judgment, finding no violations of federal transportation law. Aaacon appeals.

A private action under section 222(b)(2) can be brought to enjoin only "clear and patent" violations of the Act. As the legislative history and case law make clear, this requirement is a standard of jurisdiction rather than a burden of proof. Conf.Rep. No. 810, 89th Cong., 1st Sess. 7, *reprinted in* [1965] U.S.Code Cong.

---

\* Senior District Judge of the Northern District of Alabama, sitting by designation.

1. Two of the other defendants are involved in this appeal: Medlin's wife, Jewell, and King Dodge, a used car dealership of which Medlin is part owner. The remaining defendants, Dan Katsaros and his used car business, are absent here because they were not included in the trial court's summary judgment order. Following the grant of summary judgment, Aaacon stipulated that Katsaros and his business enterprise were to be dismissed from the case without prejudice.

& Admin.News p. 2943; S.Rep. No. 387, 89th Cong., 1st Sess. 7 (1965); H.R.Rep. No. 253, 89th Cong., 1st Sess. 12, *reprinted in* [1965] U.S.Code Cong. & Admin.News pp. 2930–31; *Tri-State Motor Transit Co. v. International Transport, Inc.,* 479 F.2d 171, 174–75 (8th Cir. 1973). *See Merchants Fast Motor Lines, Inc. v. ICC,* 528 F.2d 1042, 1045 (5th Cir. 1976); *Mercury Motor Express, Inc. v. Brinke,* 475 F.2d 1086, 1093 (5th Cir. 1973). To satisfy this jurisdictional requisite, a private complaint must allege on its face a violation that is "openly and obviously unlawful," S.Rep. No. 387, *supra;* H.R.Rep. No. 253, *supra;* and to do so it must set out the pertinent facts with a greater degree of specificity than customary notice pleading requires. *Browning Freight Lines, Inc. v. Warberg Brothers Co.,* 393 F.Supp. 127, 129 (D.Idaho 1975). In the instant case, the trial court might well have dismissed Aaacon's complaint with leave to amend, for the complaint contains only the summary allegations that defendants have engaged in the interstate drive-away business and have acted as common carriers in transporting vehicles and persons across state lines. Given the posture of the case, however, we decline to remand on such a procedural point and consider the propriety of the trial court's grant of summary judgment.[2]

Most of the facts presented to the trial court on the summary judgment motion are contained in Medlin's own deposition. Since Aaacon primarily argues on appeal that these facts establish several clear and patent violations of the Interstate Commerce Act, our main task is to review the correctness of the trial court's contrary conclusion of law. Nonetheless, Aaacon does argue the existence of a few issues of fact, and we shall deal with them in due course.

The first possible violation of the Interstate Commerce Act made out by the facts in this case concerns Medlin's employment with King Dodge, a used car company owned by the Medlin family and located in Portsmouth, Virginia. For a number of years Medlin has served as a buyer for this company, purchasing cars for its account in Miami and shipping them to Portsmouth by means of casual drivers, solicited through advertisements placed in the classified section of the *Miami Herald.* Since 1973 Medlin has shipped only five cars to Virginia, four of which were driven either by his son or wife and the remaining one by a casual driver. This last car was personally owned by Medlin and was to be delivered either to Medlin's house in Arlington[3] or to his brother's residence.

▇ The above evidence provides no support for Aaacon's claim of a clear and patent violation of the Interstate Commerce Act. In moving his own car, Medlin was not required to obtain an ICC certificate because he was acting as an exempted "private carrier,"[4] which section 203(a)(17) defines as one who "transports in interstate or foreign commerce by motor vehicle property of which such person is the owner . . . when such transportation is for the purpose of sale, lease, rent, or bailment, or in the furtherance of any commercial enterprise." 49 U.S.C. § 303(a)(17) (1970). As to Med-

---

2. Although the requirement of a clear and patent violation is jurisdictional, it is also a statutory element of a private enforcement action under § 222(b)(2). For this reason, we believe that the patency of a violation can be challenged not only by a motion to dismiss for want of jurisdiction but also by any procedural device that calls into question the factual basis for a suit, such as a motion for summary judgment.

3. Although Medlin's permanent residence is Miami, he also owns a house in Arlington, presumably because of his ties to King Dodge.

4. The Interstate Commerce Act requires that three types of motor carriers obtain certificates of public convenience and necessity: (1) common carriers, who hold themselves out to the general public as transporters engaged in interstate commerce, *see* 49 U.S.C. §§ 303(a)(14), 306(a)(1) (1970); (2) contract carriers, who furnish interstate transportation services to a limited number of persons under continuing contracts or who provide transportation services designed to meet the distinct needs of each customer, *see* 49 U.S.C. §§ 303(a)(15), 309(a)(1) (1970); and (3) those engaged in for-hire transportation outside the scope of their primary business activities, *see* 49 U.S.C. § 303(c) (1970).

lin's shipping of cars for King Dodge, we think private carriage is again a fair description of his activities, since Medlin is a part owner of King Dodge and was acting as its agent in purchasing and transporting the cars. We find support for this view in the ICC's failure in *Studna v. United States,* 225 F.Supp. 973 (W.D.Mo.1964) to challenge an automobile dealer's use of casual drivers to transport the cars that he sold.

The second possible violation in this case arises out of Medlin's association with Dan Katsaros, a used car dealer in Sacramento, who frequently purchases automobiles in Miami and has them driven to California by casual drivers. Medlin has known Katsaros for several years and on two occasions agreed to screen drivers for him. The first set of driver interviews took place in either April or May of 1974, and the second in January and February of 1975, during which time Medlin screened approximately forty applicants. These prospective drivers were solicited through advertisements placed by Medlin in the classified section of the *Miami Herald.* Medlin gave each of the applicants whom he selected an owner-driver agreement, which Katsaros had prepared. Each driver made a $50 security deposit, out of which Medlin was to pay advertising costs, any excess to be kept by Medlin for his trouble. The casual drivers were paid by Katsaros at Sacramento and were returned their deposits.[5]

█ If we were to focus narrowly on the services that Medlin performed for Katsaros, we might agree that Aaacon has shown

a clear and patent violation. In the earlier mentioned *Studna* case, the district court upheld the Commission's determination that the car dealer had to get a certificate in order to transport in interstate commerce cars belonging to other dealers. Moreover, a certificate was required in *ICC v. AAA Con Drivers Exchange, Inc.,* 340 F.2d 820 (2d Cir.) (affirming ICC ruling, *cert. denied,* 381 U.S. 911, 85 S.Ct. 1533, 14 L.Ed.2d 433 (1965), in which case a business, the present plaintiff in fact, was held to have acted as a common carrier in offering to screen and obtain casual drivers for anyone desiring drive-away services. If, however, we view Medlin's activities in the context of Katsaros' business, a different picture emerges. Katsaros purchases many automobiles in Miami each year. To ship these cars he continually advertises for casual drivers in the *Miami Herald;* he has even drawn up a form contract containing the terms of the agreement between himself and the persons selected to drive his cars. It is clear, then, that Katsaros is the one engaged in transporting cars from Miami to Sacramento, while Medlin merely provided temporary assistance to a continuing operation. The facts of this case thus differ greatly from those in *Studna* and *AAA Con,* which involved persons who solicited customers in the drive-away market, who initiated the transportation activities, who set the terms of the owner-driver relationship, and who actively made the necessary transportation arrangements. By contrast, Medlin simply acted as Katsaros' agent, assisting a transportation operation that amounted to noth-

---

**5.** This, we think, is an accurate summary of the assistance that Medlin provided Katsaros. Aaacon contends that Medlin was actually involved in the transportation of over 200 cars to Katsaros' business, but the only evidence of this involvement is a list of all the cars that Katsaros moved from Florida to Sacramento in 1975, and only fourteen cars on that list of over 200 were shipped during January and February of 1975, when Medlin was conducting driver screenings. Moreover, we do not know how many cars on the list were purchased in Miami; some were bought in Tampa and Orlando.

Likewise, no evidence fairly supports Aaacon's claim that Medlin helped Katsaros move cars to places other than Sacramento. Al-

though Aaacon has produced several advertisements from the *Miami Herald* that bear Katsaros' telephone number and that seek drivers bound for Kansas City, St. Louis, and the Midwest, these were run in April, May and June of 1975, several months after Medlin concluded his interviewing for Katsaros.

A final bit of unsupportive evidence is that the advertisements admittedly placed by Medlin on Katsaros'. behalf solicited drivers bound for Washington state and Oregon as well as for California. The explanation seems obvious: Medlin and Katsaros were interested in talking with drivers who wanted to go at least as far as Sacramento, leaving them to find other means of transportation to their final destinations.

ing more than an automobile dealer's private carriage of his own cars, wholly analogous to the previously discussed transportation activities of King Dodge.

It is also quite likely that Medlin's assistance to Katsaros comes within the exemption of section 203(b)(9) of the Act, which covers "the casual, occasional, or reciprocal transportation of passengers or property by motor vehicle in interstate or foreign commerce for compensation by any person not engaged in transportation by motor vehicle as a regular occupation or business." 49 U.S.C. § 303(b)(9) (1970). There is no evidence that Medlin was engaged in transportation as a regular occupation, and Medlin's screening of drivers for Katsaros was occasional. Moreover, according to Medlin's deposition, he helped Katsaros secure casual drivers as a favor for an old business acquaintance, a claim that is corroborated by the casual manner in which Medlin was paid.

On the facts already set forth, Aaacon makes the further argument that, even if Medlin was not required to obtain a certificate for transporting cars, he did violate the Interstate Commerce Act by engaging in the unlicensed transportation of passengers. If this argument were accepted, of course, there could be no private carriage by means of casual drivers because those drivers would always be considered passengers. Certainly the *Studna* case supports no such rule; in it the ICC conceded that the use of casual drivers to transport one's own automobiles constituted private carriage. Nor, on this point, does Aaacon receive support from *ICC v. Davidson,* 20 F.Supp. 832 (D.Neb.1937), a case decided before the widespread use of casual drivers, in which a used car dealer was held to have violated the Act by the unlicensed transportation of additional passengers in his own cars, which were themselves driven by casual drivers. The car dealer in that case specifically solicited passengers for transportation and placed several persons in each car that he shipped. Medlin, on the other hand, advertised only for drivers, as did the dealer in *Studna.*

Having examined all the facts presented to the trial court on the motion for summary judgment, we agree that no genuine issues of fact existed and hold that Medlin has not committed any clear and patent violation of the Interstate Commerce Act. Consequently, we affirm the grant of summary judgment and turn now to the remaining question on appeal, whether the trial court erred in awarding attorneys' fees to Medlin.

Section 222(b)(2) of the Act states that the prevailing party in a private enforcement action "may, in the discretion of the court, recover reasonable attorney's fees to be fixed by the court, in addition to any costs allowable under the Federal Rules of Civil Procedure." 49 U.S.C. § 322(b)(2) (1970). The Supreme Court's recent decision in *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978), holding that successful Title VII defendants can recover attorneys' fees only when the suit was frivolous, is not applicable here. As the high jurisdictional threshold of section 222(b)(2) denotes, Congress did not wish to provide the same encouragement for private claimants under the Interstate Commerce Act as it has for Title VII litigants. Section 222(b)(2) is a "self help" statute, *Schenck Transportation, Inc. v. Inter-County Motor Coach, Inc.,* 350 F.Supp. 306, 307 (E.D.N.Y.1972), designed to give injured motor carriers a form of relief less cumbersome than ICC proceedings. *See* S.Rep. No. 387, *supra;* H.R.Rep. No. 523, *supra* at 11–12, U.S.Code Cong. & Admin.News 1965, p. 2923. The private attorneys general concept, which underlies the allowance of attorneys' fees in Title VII cases, *see Albemarle Paper Co. v. Moody,* 422 U.S. 405, 415, 95 S.Ct. 2362, 45 L.Ed.2d ·280 (1975), is notably absent from section 222(b)(2) since any required vindication of public rights in such matters as these can be accomplished by the Commission itself.

Thus, the considerations which have led the Supreme Court to weigh the balance in Title VII cases in favor of recovery of attorneys' fees by successful plaintiffs and against their recovery by successful defendants are inapposite to section 222(b)(2) mat-

ters such as this. But to say that Title VII principles do not govern here falls somewhat short of saying which ones do.

■ Authority is scare on the subject, and we are driven to basic materials. The legislative history indicates that the attorneys' fees portion of section 222(b)(2) was, like its "clear and patent violation" jurisdictional standard discussed above, designed to discourage harassing lawsuits and to permit recovery of fees "where the action brought is not warranted by the facts and circumstances."[6] Obviously the inclusion of this statutory language by Congress was meant to supplement the existing equitable, nonstatutory power of a federal court to award such fees against a party guilty of oppressive conduct or bad faith.[7] Reading the statute and the legislative history in context, we conclude that where a plaintiff, such as Aaacon, brings a suit which is found to lack a section 222(b)(2) *jurisdictional* basis ("clear and patent violation"), an award of attorneys' fees to the successful defendant should follow in the absence of unusual countervailing equitable considerations not present here. This interpretation seems to us the one most consistent with the statutory language and its legislative history, and we need decide no more to dispose of the question whether fees were properly awarded in this case.

■ But while we cannot say the trial court abused its discretion in awarding attorneys' fees to Medlin's counsel, we cannot countenance the procedure followed in the course of making that award. In its order granting summary judgment, the trial judge stated that "defendants shall furnish the court with affidavits and a proposed order of final judgment with an appropriate space left blank for the awarding of attorneys' fees." This was as much notice as Aaacon received on the matter. The record shows that the affidavits requested by the court were filed on the same day that the court entered its judgment. No copies of the affidavits were forwarded to Aaacon's lawyers, and no hearing was conducted on the reasonableness of the requested amounts. Although we do not wish to shackle trial courts with any ironclad procedural rules that must always be followed whenever attorneys' fees are granted, we do believe that the court below failed to accord Aaacon even the most rudimentary requirements of notice and opportunity to dispute the matter in any way.[8] For that reason, we vacate the fee award and remand for a redetermination of the question.

AFFIRMED IN PART, VACATED AND REMANDED IN PART.

---

6. S.Rep. No. 1588, 87th Cong., 2d Sess. 6 (1962).

7. *See* 10 C. Wright & A. Miller, Federal Practice & Procedure: Civil § 2675 at 192 (1973).

8. We find wholly unmeritorious Aaacon's similar claim that it was not given a fair opportunity to respond to Medlin's motion for summary judgment. Although Aaacon was apparently experiencing difficulty with local counsel when the motion was filed, the case had been on the docket for over ten months, and the trial date was only a month away. The trial court granted Aaacon one extension of time on the motion; it did not abuse its discretion in refusing to grant a second.