**CITY OF EL PASO, Plaintiff,**

v.

**AUTOBUSES INTERNACIONALES S. de R. L., Defendant.**

**No. EP–79–CA–176.**

United States District Court, W. D. Texas, El Paso Division.

Aug. 20, 1980.

**8**

John A. Langford, El Paso, Tex., for plaintiff.

Sanford C. Cox, Jr., El Paso, Tex., Edwin E. Piper, Jr., Albuquerque, N. M., for defendant.

## MEMORANDUM OPINION AND ORDER

HUDSPETH, District Judge.

This case presents unusual questions concerning the authority of the Interstate Commerce Commission versus that of a municipality to regulate the operations of a passenger bus service in a border city. The Plaintiff, City of El Paso ("City"), originally brought this action in the State District Court, but Defendant removed it to Federal Court. Jurisdiction is based upon 28 U.S.C. §§ 1337 and 1441. At a non-jury trial, the following facts were adduced:

The Defendant, Autobuses Internacionales S. de R. L. (hereinafter called "Autobuses"), is a Mexican corporation which is engaged in the business of operating passenger bus service between Juarez, Mexico, and various points in the States of Texas and New Mexico. It bases its authority to operate its various routes upon several permits issued by the ICC over a period of years. Its routes pass through the city limits of the Plaintiff, City of El Paso, where the buses are popularly known as the "Red Buses."

The first permit was issued in September 1959, when Defendant acquired an ICC Certificate of Convenience and Necessity, authorizing the transportation of passengers and baggage

"Between El Paso, Texas, and the boundary of the United States and Mexico at or near Puente Libre Road, serving all intermediate points, from El Paso over Paisano Drive to the boundary of the United States and Mexico, and return over the same route."

This authority was for the United States portion of an international route from downtown El Paso to Juarez via the Cordova Bridge or "Free Bridge" (now renamed the "Bridge of the Americas"). After Defendant obtained its ICC permit, the El Paso City Attorney questioned the jurisdiction of the ICC over this particular route. As a consequence, the following month the City and Autobuses entered into a written contract providing for the operation of this "Puente Libre" route. The contract acknowledged the authority of Plaintiff to enforce its traffic laws, to restrict the number and locations of stops, and to require Defendant to pay a two percent (2%) "street rental" for the use of its streets.

In 1960, Autobuses applied to the ICC for a second certificate to serve the downtown El Paso and downtown Juarez areas over the Santa Fe and Stanton Street bridges (the "downtown" bridges). The ICC denied the permit, commenting that the application was unnecessary, because the contemplated service was solely between "contiguous municipalities" and exempt from ICC regulation. The red buses did not operate over this route until 1974, when the City and Autobuses agreed to an addendum to their 1959 contract allowing Autobuses to operate the downtown service over a discontinued street car route between El Paso and Juarez.

Over the next few years, Defendant acquired additional ICC permits authorizing services between Mexico and various points in Texas and New Mexico outside the El Paso City limits.[1] During the same period

---

1. Current routes running through El Paso, Texas, are authorized under the following certificates:

*MC 112934 Sub 6 provides these routes:*
A. From Meadow Vista, New Mexico, over city streets to the ports of entry on the United

of time, the Plaintiff acquired three privately-owned bus lines and created the Sun City Area Transit system (SCAT), a municipal bus service offering intracity transportation over routes frequently overlapping those of the Defendant. Further, although Autobuses is strictly limited by its grants of authority to transporting passengers between Mexico and United States points, the City learned that intracity passengers were utilizing the red buses, raising concerns about loss of revenue to the SCAT system. The Plaintiff also claimed that Defendant's buses were deviating from their assigned routes, and using SCAT bus stops to pick up and release passengers. The president of Autobuses, Dr. M. Garcia-Godoy, attended a City Council meeting on August 22, 1978, at which a vigorous argument arose over these allegations. The City Council informed Dr. Garcia-Godoy that the 1959 contract and 1974 addendum would be cancelled. Dr. Garcia-Godoy acquiesced in this action, understanding the cancellation to be effective immediately. The City, however, considered the contract and addendum still in effect until March 27, 1979, when it was formally terminated by the City Council. In any event, Defendant has continued to provide its bus service without interruption, contending that its ICC permits furnished authority regardless of City Council action.

Plaintiff then brought this suit for injunctive relief, requesting that Defendant be enjoined from deviating from the routes designated in its ICC certificates; that it be enjoined from operating certain routes without first obtaining a franchise from the Plaintiff; that it be enjoined from picking up and discharging intra-city passengers, and from making stops other than at specific stops and stands designated by the City Traffic Engineer. Further, Plaintiff seeks to require Defendant to pay a street rental of two percent of gross receipts on all operations on its streets not covered by ICC certificates; to require an accounting of all revenues obtained by Autobuses under the 1959 contract between August 1978 and March 1979; and to enjoin operation of any intra-city charters by the Defendant without a franchise from Plaintiff.

Defendant denies that Plaintiff is entitled to any of the relief sought, and by way of counterclaim, contends that Plaintiff is interfering in a federally preempted area of commerce. Defendant seeks injunctive and declaratory relief against any continued interference.

## A. Is Defendant Deviating from Its ICC Assigned Routes?

Plaintiff contends that Defendant's buses do not use the routes designated in its ICC certificates, but wander at will through the streets of El Paso, picking up and discharging passengers. The evidence at trial sup-

States-Mexico Boundary line near Meadow Vista, thence over New Mexico Highway 273 to junction Texas Highway 20, thence over Texas Highway 20 to El Paso and ports of entry on the United States-Mexico Boundary line at or near El Paso, and return over the same route.
    B. From the ports of entry on the United States-Mexico Boundary line at or near El Paso over city streets to junction Texas Highway 20, thence over Texas Highway 20 to Ysleta, Texas, thence over Texas Highway 20 to junction Texas Farm Road 258 to Clint, Texas, thence over Texas Highway 20 to Fabens, Texas, thence over Texas Farm Road 1109 to the United States-Mexico Boundary line located at or near Fabens, and return over the same route.
    C. From the ports of entry on the United States-Mexico Boundary line at or near El Paso over city streets to junction of U.S. Highway 62–180, thence over U.S. Highway 62–180 to junction Texas Farm Road 1437, thence over

Texas Farm Road 1437 to New Mexico-Texas State line, thence over unnumbered road to Mattox Ranch, New Mexico, and return over the same route.
    *MC 112934 (Sub-No. 8TA) granted temporary authority for the following service:*
    From the port of entry on the International Boundary line between the United States and Mexico at or near El Paso, Texas, from the port of entry on the International Boundary line over bridges through El Paso, Texas, then over city streets to junction with New Mexico Highway 28, then over New Mexico Highway 28 to junction U. S. Highway 80 and Interstate Highway 10 at or near Mesilla, New Mexico, then over U. S. Highway 80 and Interstate 10 to junction U. S. Highway 180 at or near Deming, New Mexico, then over U. S. Highway 180 to Silver City, New Mexico, and return over the same route, serving all intermediate points....

ports this claim.[2] Defendant admits that its buses travel circuitous routes before arriving at the designated streets and highways. Furthermore, its president, Dr. Garcia-Godoy, testified emphatically that it was his position that Autobuses could use *any* El Paso street which the company deemed appropriate to best serve its customers. Defendant's position is based upon its broad interpretation of the phrase, "over city streets," which appears in the certificates issued to it by the ICC. Further, it asserts that this court lacks jurisdiction to decide the issue. The jurisdictional question will be discussed first.

Private enforcement, as opposed to ICC enforcement, is authorized under 49 U.S.C. § 11708. Autobuses alleges two defects in Plaintiff's action under the provisions of this statute: (1) Lack of full compliance with § 11708(b), which requires that a copy of the complaint be served upon the ICC and that a certificate of service appear in the court-filed complaint; and (2) Lack of a sufficiently "clear and patent violation" to invoke this Court's jurisdiction under § 11708(a).

█ The use of the terms such as "shall" and "must" indicate the mandatory nature of the requirements of § 11708(b). The statute evidences Congress' intent to provide the ICC with notice of and opportunity to intervene in actions involving interpretations of ICC regulations and certificates. The ICC was notified of this action in February 1980, by Plaintiff's counsel in a letter which included a copy of Plaintiff's complaint. (Plaintiff's Exhibit No. 28). The letter was mailed to the Regional Counsel of the ICC in Fort Worth, Texas, after this Court's jurisdiction had been invoked by the Defendant by removal from State Court. The ICC has taken no action with regard to this suit, and there is no indication of any desire on its part to do so. Although not a strict observance of the service required in Rule 4, F.R.Civ.P., the letter was sufficient to provide the agency with actual notice, and it substantially complied with the statutory requirement of § 11708(b). As for the failure to include a certificate of service, this defect could easily be cured by allowing an amendment to the complaint under Rule 4(h), F.R.Civ.P. However, in the interest of serving one of the more crucial purposes of § 11708—the elimination of delay and the provision of "prompt and effective" relief, *Baggett Transportation Co. v. Hughes Transportation, Inc.*, 393 F.2d 710, 715 (8th Cir. 1968), *cert. denied* 393 U.S. 936, 89 S.Ct. 297, 21 L.Ed.2d 272—this Court will accept the notice already provided as sufficient to satisfy § 11708(b), and will not require an amendment of the complaint.

█ Section 11708(a) requires that a "clear violation" of the Interstate Commerce Act provisions be shown. Courts have interpreted this as a jurisdictional requirement rather than a burden of proof. *AAACon Auto Transport, Inc. v. Medlin*, 575 F.2d 1102, 1103–04 (5th Cir. 1978). Plaintiff's complaint contains only summary allegations stating that Autobuses holds certain permits from the ICC and that its buses fail to follow the routes specified therein. Normally, these allegations would be insufficient and, as the court in *AAACon* noted, dismissal of the complaint with leave

---

**2.** For example, Defendant has authority from ICC (Certificate No. 112934 Sub 6) to operate a bus route from the port of entry in downtown El Paso "over city streets" to the junction of Texas Highway 20; thence over Highway 20 to Ysleta, Texas; thence over Highway 20 to the junction with Farm Road 258; thence over Farm Road 258 to Clint, Texas; thence over Highway 20 again to Fabens, Texas; thence over Farm Road 1109 to the United States-Mexico border; and return over the same route. It would be possible for a bus to proceed directly from the port of entry to Texas Street (Texas Highway 20), located in downtown El Paso only a few blocks from the bridge, and to follow Texas Highway 20 via Texas Street and Alameda Avenue all the way to Ysleta. Instead, Defendant's buses actually travel from the port of entry over El Paso Street to Overland, west one block on Overland to Santa Fe, north on Santa Fe to Yandell, then over Yandell to Montana, over Montana east to Airway, south on Airway to Gateway East, east on Gateway East to Yarbrough, then south on Yarbrough to Alameda (Texas Highway 20). By this circuitous route, Defendant's buses travel 15 miles or more before effecting a junction with Texas Highway 20.

to amend may have been proper at an earlier point in the proceedings. *Id.* at 1104. However, Defendant never raised this issue until the beginning of the trial, and the Court has now heard all the relevant evidence pertaining to it. Considering the current posture of the case, this Court will consider whether the facts presented at trial were sufficient to confer jurisdiction under the "clear and patent" standard.

■ The City's deviation claim, as previously noted, stems from a difference in interpretation of the phrase "over city streets." Autobuses contends that "over city streets" in each certificate permits its use of *any* street in El Paso, no matter how circuitous its route, so long as the bus leaves the city limits by the street designated in its certificate. The City's position is that "over city streets" enables the Defendant only to use a city street on a more or less direct path to the junction with the first designated street. Expert testimony was offered by both parties in support of their positions. From a review of the evidence and authorities offered by both sides, it is clear that Autobuses has used, is using, and contemplates using routes that constitute such a gross deviation from the authority granted by the ICC as to amount to a "clear and patent" violation of such authority.

The term "over city streets" has been construed broadly to mean over *any* city street. The *Hudson Bus Transportation Co., Inc., Passenger Service,* 46 M.C.C. 377 (1946). However, the ICC and the courts have also required the use of reason and common sense in construing that term. *De-Camp Bus Lines v. U. S.,* 224 F.Supp. 196 (D.N.J.1963); *Hudson Bus, supra.* In *Hudson,* the Commission stated "[W]here streets have been specified or named in the authority granted, [ ] a carrier holding such authority of course may not operate within the municipalit[y] . . . over streets other than those specified." *Hudson Bus Transportation Co., supra,* 46 M.C.C. at 383. It is only when "streets *within a municipality* have not been designated" that a carrier is free to operate over *any* city street within

the municipality. *Id.* (emphasis added). In the certificates involved in the instant suit, each grant of authority does designate some streets which are at least partially within the city limits, and these designated streets are in close proximity to the ports of entry at which Defendant's buses enter the United States in traversing the respective routes.

■ In the *DeCamp* case, the court held that the "over city streets" language did not authorize a motor carrier to use indirect or circuitous routes. Where the authority contemplated an operation that was generally east and west, the carrier could not circumvent this general intent by creating a north-south route merely because of the broad "over city streets" language. "To permit a carrier to interpret a certificate such as the one under consideration to authorize such operations would be a gross distortion of the rights conferred and would create chaos." *DeCamp Bus Lines v. United States, supra,* 224 F.Supp. at 208. The proof concerning the actual operations of Defendant's buses, and the vehement assertions by Defendant's president that the buses could operate upon *any* street in El Paso, demonstrate the very type of "gross distortion of rights conferred" which the *DeCamp* court held unreasonable. To allow the buses to roam at will throughout the city until Defendant determines that it is suitable to junction with the designated streets does violence to the clear language and intent of the certificates. "Over city streets," in the context of the certificates before this Court, clearly contemplates a reasonably direct route over streets to a junction with the first specifically designated street or highway.

■ Autobuses also claims that the City lacks standing to seek injunctive relief because no injury to the City has been proven. Defendant cites the case of *Nationwide Auto Transporters, Inc. v. Morgan Driveaway, Inc.,* 459 F.Supp. 981, 984 (S.D. N.Y.1978) for the proposition that no party except one who is itself authorized by the ICC to conduct such operations as those in issue can show sufficient injury to warrant

**12**

injunctive relief. This reading of *Nation-wide* is entirely too restrictive. Few could seriously contend that a city has no "legally protected interest" in the operations of passenger buses over its streets. A city's basic function is to provide for the safety and welfare of its citizens, and it may carry out this function through regulations governing the use of its streets. Autobuses' present operations and contemplated future operations patently invade the City's right to reasonably regulate the use of its streets and to protect the well-being of its citizens. The City has proved injury both to itself and its citizens sufficient to invoke this Court's jurisdiction and its power to grant injunctive relief.

█ Certificates of public convenience and necessity issued by the ICC do not authorize carriers to roam wherever they choose. *Mars Express, Inc. v. David Masnik, Inc.*, 401 F.2d 891, 894 (2d Cir. 1968). Rather, a carrier's authority is expressly limited to the use of streets designated in such certificates and the use of reasonably direct routes "over city streets" to reach those designated streets. This Court so finds and will enter an order accordingly.

B. *Is Defendant Required to Obtain a Franchise from Plaintiff?*

Section 22–4 of the El Paso City Code provides:

"No person shall, without a franchise granted by the city council, engage in the business, as a common carrier, of carrying passengers from any point within the city or its suburbs to another point within the city or its suburbs."

█ The language of the ordinance itself makes it clear that it does not apply to the routes served by Defendant. All of Defendant's authorized routes originate or terminate outside the City of El Paso. The ordinance by its own terms does not require Defendant to obtain a franchise for its operations, and the Plaintiff's claim for relief in this respect must be denied.

However, Plaintiff claims that Autobuses is in fact engaged in the transportation of intra-city passengers, and, therefore, comes within the ordinance's terms. Plaintiff seeks either to enjoin Defendant from carrying those passengers, or to require it to comply with the franchise ordinance. Autobuses maintains that it does not desire nor intend to conduct intra-city transportation, and that it is taking every reasonable measure to insure that no such operations are conducted. The Court finds from the evidence that Defendant has engaged in transportation of intra-city passengers in significant numbers and without authority. The Court further finds that reasonable precautionary measures are available to Defendant to prevent such unauthorized traffic.

█ Intra-city passenger service is an area subject to the City's regulation under its ordinances. Defendant's operations that permit such service hamper the City's ability to provide adequate services through its own SCAT bus system. Although Defendant's contention that a municipal ordinance cannot be enforced by injunction has merit, it is not applicable here. Autobuses' intra-city operations are in excess of its authority under its ICC permits, not merely violations of the city ordinance. Further, the availability to Plaintiff of other adequate remedies is questionable. Therefore, Defendant will be enjoined from operating intra-city transportation in contravention of its authority.

C. *Is Defendant Entitled to Operate Its "Puente Libre" and "Street Car Loop" Routes?*

Defendant's authority to operate bus service between Juarez and El Paso over the Bridge of the Americas (Puente Libre) is derived from ICC Certificate No. MC–1129314, issued September 18, 1959. The certificate is still in force and effect, has not been revoked, and Plaintiff has instituted no proceedings in the ICC to cause its revocation. Plaintiff contends, however, that Juarez and El Paso are contiguous municipalities; that bus service between contiguous municipalities is exempt from ICC regulation; and that, since its agree-

ment with the City has been revoked, Autobuses no longer has authority to serve this route.

It has been held that service between two contiguous municipalities is exempt from ICC regulation, even though one of them lies in a foreign country. *Verbeem v. United States,* 154 F.Supp. 431 (E.D. Mich.1957), *aff'd* 356 U.S. 676, 78 S.Ct. 1006, 2 L.Ed.2d 1072 (1958) (Detroit and Windsor, Ontario). However, the Interstate Commerce Commission has recognized that a serious question exists as to whether cities on opposite sides of the Rio Grande boundary between Texas and Mexico are "contiguous," because of intervening land owned by the Federal Government of Mexico. *Rio Grande Border Municipalities,* 110 M.C.C. 51 (1969). In this case, Plaintiff offered no evidence to establish that El Paso and Juarez are "contiguous" within the meaning of the law and regulations, and the Court cannot so find. Similarly, no evidence was offered as to whether Juarez-El Paso bus service falls within the "commercial zone" exemption. 49 U.S.C. § 10526(b)(1), 49 C.F.R. § 1048.101; *Rio Grande Border Municipalities, supra.* In any event, the Interstate Commerce Commission, which is empowered to determine transportation policy, is the proper forum within which Plaintiff should seek modification or revocation of Defendants' 1959 certificate.

Defendant's bus service over the "street car loop" has a different history. In 1960, Autobuses applied to the ICC for a permit to serve downtown El Paso and Juarez over a route very similar to the present one. The ICC declined to issue a certificate, finding that none was required under the "contiguous municipality" exemption. *Autobuses Internacionales Ext. Tornillo, Texas,* 84 M.C.C. 216 (1960). Some years later, in *Rio Grande Border Municipalities, supra,* the ICC came to the conclusion that a serious question existed as to whether or not Mexican border cities were "contiguous," but Defendant apparently did not reapply for a certificate at that time. In April 1974, when an international streetcar service formerly operated by El Paso City lines was

discontinued, Plaintiff granted Defendant authority to operate its buses over the following route:

"From the international line of the Santa Fe Street Bridge north to South El Paso Street, north on South El Paso Street to San Antonio Avenue, east on San Antonio Avenue to Stanton Street, south on Stanton Street to Ninth Street, thence to the international line of the Stanton Street Bridge."

Between the date this authority was granted and the date the City moved to revoke it in 1978, Autobuses obtained another certificate from the ICC (No. MC 112934 Sub 6), authorizing it to transport passengers between Juarez and Meadow Vista, New Mexico, and Juarez and Fabens, Texas, "serving all intermediate points." The certificate describes the Fabens route in pertinent part as follows:

"Between the ports of entry on the United States-Mexico Boundary line at or near El Paso and Fabens, Texas, serving all intermediate points: From the ports of entry on the United States-Mexico Boundary line at or near El Paso over city streets to junction Texas Highway 20 ... and return over the same route."

The Court finds from the evidence that the so-called "street car loop" lies entirely within the most direct route over city streets between the Santa Fe Street Bridge and Texas Highway 20 (Texas Street), and between Highway 20 and the Stanton Street Bridge, which returns traffic to Juarez, Mexico. Such service, therefore, constitutes service to "intermediate points" authorized by the ICC certificate. Plaintiff is therefore not entitled to the injunctive relief sought. Once again, the Interstate Commerce Commission itself is the proper forum in which to seek modification or revocation of an apparently valid certificate.

### D.  *Is Plaintiff Entitled to Street Rental?*

Section 22–2(b) of the El Paso City Code levies a two percent (2%) "street rental" on gross receipts from all passenger bus operations conducted on the public streets of El Paso. Section 22–2(a) exempts from the

street rental requirement those buses operating under a permit or certificate issued by the ICC, unless the operations so authorized are "between contiguous municipalities," in which case the street rental is applicable. This last provision was added to the Code by amendment in July 1979, presumably with the Defendant specifically in mind.

Texas law governs the authority of municipalities to levy street rental charges upon motor vehicles for hire. Article 6698, Tex.Rev.Civ.Stat.Ann., provides in pertinent part as follows:

"Nothing herein shall in anywise authorize or empower any county or incorporated city or town in this state to levy and collect any occupation tax or license fees on motorcycles, motor vehicles, or motor trucks; provided that such cities or towns are hereby authorized and empowered to levy and collect a city permit fee, not to exceed two (2%) percent per annum, for the operation of each motor vehicle transporting passengers for hire, or a street rental charge based upon gross receipts, not to exceed two (2%) percent per annum, for the operation of motor vehicles transporting passengers for hire, *other than motor vehicles operating under a permit or certificate of* the Railroad Commission of the State of Texas or *the Interstate Commerce Commission . . . .*" (Emphasis added.)

■ All of Defendant's passenger bus operations in the City of El Paso and on its streets are based upon certificates issued by the Interstate Commerce Commission, and Article 6698 does not grant authority for imposition of a street rental charge under those circumstances. Therefore, Plaintiff's street rental ordinance is not applicable to Defendant.

Furthermore, the evidence fails to establish that the "contiguous municipality" exception in the ordinance applies to Autobuses. It is true that service between two contiguous municipalities, even though one of them lies in a foreign country, may be exempt from ICC regulation. *Verbeem v. United States, supra.* As already noted, however, there is a question whether cities on opposite sides of the Rio Grande boundary between Texas and Mexico are actually "contiguous," because of intervening land owned by the federal government of Mexico. *Rio Grande Border Municipalities,* 110 M.C.C. 51 (1969). Plaintiff offered no evidence to establish that El Paso and Juarez are "contiguous" within the meaning of the law and regulations. The Plaintiff's claim that it is entitled to a two percent street rental must fail.

■ A related question is the Plaintiff's claim that under its 1959 contract with Defendant, it is entitled to street rental fees equal to two percent of Defendant's gross receipts between August 1978 and March 1979. Art. 6698 does not prohibit enforcement of a contractual agreement to pay street rental; and, if the contract between these parties remained in effect until March 1979, Plaintiff would be entitled to an accounting of Defendant's gross receipts until that time. The Court finds, however, that the 1959 contract was terminated August 22, 1978, by mutual agreement of the parties. The formal action of the City Council "terminating" the contract the following March did not have the legal effect of extending an agreement already ended by mutual consent. Plaintiff's demand for an accounting must therefore be denied.

E. *May Defendant be Required to Use Designated Stops and Stands?*

■ Plaintiff asks the Court to order Defendant to apply to the City Traffic Engineer for the designation of stops and stands along its authorized routes. Sections 20–89, 20–90, and 20–91, of the City Code authorize and require the City Traffic Engineer to establish stops and stands, and further require that buses must use the stops and stands so designated. The City clearly retains power to enforce such general safety regulations. *Railroad Transfer Service v. City of Chicago,* 386 U.S. 351, 87 S.Ct. 1095, 18 L.Ed.2d 143 (1967). However, the City Code imposes no duty upon Autobuses to *apply* to the City for such designation; the affirmative duty rests with the Traffic Engineer. Once stops and stands are estab-

lished in a reasonable and non-discriminatory manner, Defendant will be obligated to use them or face the penalties provided by the City Code. Now that the Court has ruled that Autobuses must follow the routes specifically designated in its certificates, no reason appears why Plaintiff's Traffic Engineer cannot begin immediately to designate stops and stands along such routes to promote traffic safety. No injunctive relief is necessary or appropriate.

### F. *Should Defendant be Enjoined from Operating Intra-city Charter Service?*

Plaintiff also asks for an injunction restraining Defendant from providing intra-city charter services. Insufficient evidence was offered at trial to establish that Autobuses is in fact engaged in providing such services. Plaintiff has therefore failed to carry its burden as to this point.

### G. *Defendant's Counterclaim.*

Autobuses has counterclaimed for a declaratory judgment and injunctive relief against the City, claiming that the City is engaged in a continuing scheme to interfere with or eliminate the operations of Defendant within the City of El Paso. The Court will assume, however, that the instant opinion and accompanying judgment will clarify the rights of the parties in such a way that any future disputes can be resolved through appropriate administrative and legal procedures. No necessity for a declaratory judgment or injunctive relief against the City appears at this time.

### H. *Conclusion.*

In light of the foregoing discussion, a judgment will be entered enjoining Defendant from deviating from the routes assigned it under its ICC certificates and from transporting intra-city passengers without authority, and denying all other relief sought by Plaintiff. The relief sought in Defendant's counterclaim will be denied.